REVISED November 19, 2007

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 15, 2007

Charles R. Fulbruge III
Clerk

No. 05-41723

BRIAN WRIGHT, INDIVIDUALLY & AS NEXT FRIEND AND HEIRS AT LAW
OF CADE WRIGHT, DECEASED; LISA WRIGHT, INDIVIDUALLY AND AS
NEXT FRIEND AND HEIRS AT LAW OF CADE WRIGHT, DECEASED,

Plaintiffs-Appellants,

versus

FORD MOTOR COMPANY,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Texas

Before GARWOOD, BARKSDALE, and GARZA, Circuit Judges.

GARWOOD, Circuit Judge:

In this Texas law diversity suit, plaintiffs-appellants, Brian
Wright and Lisa Wright, appeal the take nothing judgment in favor
of defendant-appellee Ford Motor Company, in their product
liability wrongful death and survival action for the death of their
three year old son Cade Wright. Appellants alleged claims of
strict liability for marketing defect and design defect respecting

the third party owned and operated Ford 2001 XLT Expedition which backed over Cade Wright. The trial court granted summary judgment for Ford on the marketing defect claim and the jury found for Ford on the design defect claim.

Appellants raise four claims of error. They assert that the district court erred (1) by instructing the jury under TEX. CIV. PRAC. & REM. CODE § 82.008(a) & (b) concerning the vehicle's compliance with relevant federal safety standards, (2) by granting Ford's motion for summary judgment on their marketing defect claim, (3) by excluding evidence of their expert's testing, and (4) by allowing certain testimony of Ford's expert.

Ford, in addition to defending the district court's referenced rulings, further argues that the district court erred in two other rulings which, if corrected, would provide alternate grounds to affirm the judgment. Ford argues in this connection that the district court erred, first, in denying its motion for judgment as a matter of law, and, second, in denying Ford's challenge to the testimony of appellants' expert witness.

We affirm the judgment below and find it unnecessary to address Ford's mentioned alternative grounds for affirmance.

**Facts and Proceedings Below**

This case emerges from the horribly tragic accident that claimed the life of three-year-old Cade Wright.

On June 30, 2003, the Wrights took their young son, Cade, to a snowcone stand in Groves, Texas. As appellants' brief states, "Brian [Wright] parked his truck to the left and slightly behind an [2001 Ford] Expedition XLT owned by Robin and Darren McCutcheon . . . such that the passenger door of the [Wright's] truck was approximately parallel to the rear bumper of the Expedition." The Wrights' truck was parked approximately 40 to 60 feet from the snowcone stand. The parking lot was crowded and there was no organized manner of parking. The lot was not lined, so customers for the snowcone stand parked in any area of the lot where there was room in what could be characterized as a random, haphazard fashion.

While the Wrights were parking their truck, Darren McCutcheon was waiting in line at the snowcone stand to purchase his family's snowcones while Robin McCutcheon remained in the Expedition with their two young children. Brian Wright soon joined the snowcone line, carrying Cade in his arms, while Lisa Wright remained in the truck. After Brian received the first snowcone in his order, he placed Cade on the ground and gave him the snowcone.[1] Cade then

---

[1]Evidence presented at trial conflicted as to whether Brian Wright allowed Cade to walk several times back and forth through the parking lot between the snowcone stand and the family's truck or whether Brian held Cade in his arms the entire time, until allowing him to walk alone back to the truck. It is undisputed that Cade was allowed, at least one time, to walk unaccompanied back to the truck through the busy parking lot.

began to walk alone through the parking lot to his mother waiting in the truck. Brian signaled to Lisa that Cade was on his way to the family truck but Lisa did not see the signal and did not realize Cade was walking toward her through the parking lot. Brian then turned back to pay for the snowcones once he saw Cade walk between the truck and the McCutcheons' Expedition.

During this same time, the McCutcheons were preparing to leave the parking lot since Darren had returned with the snowcones. Robin, the driver, placed the Expedition in reverse, checked her rearview and side mirrors, and then took her foot off the brake pedal to begin backing out of her parking area without accelerating. In a matter of seconds, the McCutcheons both heard a "thump" and, realizing she had hit something, Robin immediately braked and placed the Expedition in drive, moving forward a few feet.

Darren and Robin McCutcheon exited the vehicle and, upon reaching the rear of the driver's side of the Expedition, realized Robin had backed over Cade, who was lying on the pavement dead, crushed by the Expedition's tire. At this time, Lisa Wright had also heard the "thump," and opened the door of her truck to see Cade's dead body. The Expedition's left rear bumper had struck Cade approximately at his shoulder blades, throwing him face down into the parking lot; the Expedition's left rear tire then rolled over Cade, killing him.

4

Darren McCutcheon had purchased the Expedition from Energy Country Ford in Port Arthur, Texas, in July 2001 as a new vehicle. Though he knew the reverse sensing system was available as an option on the Expedition, labeled as a "reverse/rear parking aide/assist or back-up alarm," he chose not to have that particular option installed.[2] On January 8, 2004, the Wrights instituted this diversity action in the district court below against Ford asserting products liability and negligence claims. On May 23, 2005, the district court granted in part Ford's December 29, 2004 Motion for Summary Judgment, granting Ford judgment as a matter of law with regard to the Wrights' claims for manufacturing and marketing defects based on a theory of strict products liability or negligence. The district court allowed the Wrights' design defect claim to proceed to trial under both a strict products liability and a negligence theory.

The Wrights' July 1, 2005, Second Amended Complaint alleged, inter alia: that the McCutcheons' Expedition "had a large and unreasonably dangerous blind spot immediately behind the vehicle and was not equipped with any of the many viable and economically feasible safety devices, including back-up alarms, which were available on other Ford S.U.V.'s at the time"; that Ford should have included the reverse sensing system as mandatory standard

_____

[2]The Wrights contend that Ford created the ultrasonic reverse sensing system because it was aware of the dangers of blind spots behind vehicles, where a driver "is virtually blind to small objects . . . such as dogs, bicycles, or children." The parties disagree whether such a warning, assuming the system detected Cade, would have actually saved Cade's life.

5

equipment on all Expedition models; and, on that basis, Ford should be held negligent and strictly liable for defects in design, manufacture, and marketing of the Expedition.

Before the case went to jury, the Wrights withdrew their negligence claim. The jury then returned a verdict against the Wrights on their design defect claim, responding "no" to the first interrogatory which asked "was there a design defect in the 2001 Ford Expedition at the time it left the possession of Ford Motor Company that was a producing cause of the occurrence in question?". The remaining interrogatories were not answered as they were submitted conditionally on an affirmative answer to the first. Final judgment was entered on July 22, 2005, and the Wrights timely filed their Notice of Appeal.

## Discussion

### Jury instruction on compliance with federal safety standards

We review properly preserved claims of jury instruction error for abuse of discretion using a two-part inquiry, giving the district court discretion to fashion jury instructions. The Wrights first "must demonstrate that the charge as a whole creates 'substantial and ineradicable doubt whether the jury has been properly guided in its deliberations.'" *Flores v. Cameron County, Tex.*, 92 F.3d 258, 262 (5th Cir. 1996); *EEOC v. Manville Sales Corp.*, 27 F.3d 1089, 1096 (5th Cir. 1994). "Second, even if the

6

jury instructions were erroneous, we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case." *Flores*, 92 F.3d at 262.

The only issue to reach the jury was the Wrights' design defect claim. The Wrights claim the district court erred in instructing the jury to rebuttably presume that the Ford Expedition was not defectively designed, pursuant to Texas Civil Practice and Remedies Code § 82.008. Section 82.008 provides:

> "(a) In a products liability action brought against a product manufacturer . . . there is a rebuttable presumption that the product manufacturer . . . is not liable for any injury to a claimant caused by some aspect of the . . . design of a product if the product manufacturer . . . establishes that the product's . . . design complied with mandatory safety standards or regulations adopted and promulgated by the federal government, or an agency of the federal government, that were applicable to the product at the time of manufacture and that governed the product risk that allegedly caused harm.
>
> (b) The claimant may rebut the presumption in Subsection (a) by establishing that:
>> (1) the mandatory federal safety standards or regulations applicable to the product were inadequate to protect the public from unreasonable risks of injury or damage; or
>> (2) the manufacturer, before or after marketing the product, withheld or misrepresented information or material relevant to the federal government's or agency's determination of adequacy of the safety standards or regulations at issue in the action." TEX. CIV. PRAC. & REM. CODE § 82.008.

Ford claims it complied with the relevant safety standard governing the risk at issue—Federal Motor Vehicle Safety Standard No. 111,

7

"Rearview Mirrors"(FMVSS 111).[3] 49 C.F.R. § 571.111 (1998). FMVSS 111 addresses rearview mirror performance placement in order to protect the public from backing into deaths and injuries due to limited rearview vision. Therefore, Ford claims it is entitled to the presumption of no defect provided by section 82.008(a).

The judge instructed the jury that the presumption was applicable and that it could be rebutted if the Wrights established that the federal standard was inadequate to protect the public. The jury instruction at issue stated:

> "You are instructed that Ford Motor Company complied with a mandatory federal safety standard or regulation existing at the time of manufacture that was applicable to the product and that governed the product risk that allegedly caused harm and, therefore, is presumed not to be liable for the injuries to claimants. The claimants may rebut the presumption by establishing that the mandatory federal safety standard or regulations applicable to the product were inadequate to protect the public from unreasonable risks of injury or damage."

The Wrights contend that the jury instruction was erroneous for two reasons: (1) the purported federal standard, Federal Motor Vehicle Safety Standard No. 111 (FMVSS 111),[4] does not govern the

_____

[3]FMVSS 111 provides standards regarding rearview mirrors in vehicles, providing:

"S1. *Scope*. This standard specifies requirements for the performance and location of rearview mirrors.

S2. *Purpose*. The purpose of this standard is to reduce the number of deaths and injuries that occur when the driver of a motor vehicle does not have a clear and reasonably unobstructed view to the rear.

S3. *Application*. This standard applies to passenger cars, multipurpose passenger vehicles, trucks, buses, schoolbuses and motorcycles." 49 C.F.R. § 571.111.

[4]49 C.F.R. § 571.111.

8

rear sensing system with which they argue the Expedition should have been equipped; and (2) the presumption that a vehicle is not defective if it complies with FMVSS is rebuttable and should not be conveyed to the jury once a plaintiff produces evidence rebutting it.

(a) The Wrights first argue that the applicability of FMVSS 111 is confined by its scope, rearview mirror performance and placement, and this case concerns the absence of a reverse sensing system—thereby rendering the section 82.008 presumption instruction erroneous since section 82.008 is only triggered when a federal statute actually applies to the defect at issue. To support their arguments, they point to the legislative history of section 82.008, in which there is some discussion that the statute does not apply to a defect not asserted. Rearview mirrors are not the defect here—the lack of a reverse sensing system combined with an overly large rear blind spot are. Ford maintains, and we agree, that the risk that caused the harm in this case is precisely what FMVSS 111 covers, as stated in section 571.111 S2—its "purpose" is to reduce the number of injuries and deaths "that occur when the driver of a motor vehicle does not have a clear and reasonably unobstructed view to the rear." See note 3 *supra*.

When we interpret a Texas statute, we follow the same rules of construction that a Texas court would apply—and under Texas law the starting point of our analysis is the plain language of the statute. *See International Truck and Engine Corp. v. Bray*, 372

F.3d 717, 722 (5th Cir. 2004) ("When we interpret state law . . .

we . . . apply the law as the state's highest court would.");

*National Liability and Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527

(Tex. 2000) ("In construing a statute, our objective is to

determine and give effect to the Legislature's intent [and] first

look at the statute's plain and common meaning[, presuming] that

the Legislature intended the plain meaning of its words.").  As the

Texas Supreme Court described in *Fitzgerald v. Advanced Spine

Fixation Sys., Inc.*, 996 S.W.2d 864, 866 (Tex. 1999):

> "There are sound reasons we begin with the plain language
> of a statute before resorting to rules of construction.
> For one, it is a fair assumption that the Legislature
> tries to say what it means, and therefore the words it
> chooses should be the surest guide to legislative intent.
> Also, ordinary citizens should be able to rely on the
> plain language of a statute to mean what it says.
> Moreover, when we stray from the plain language of a
> statute, we risk encroaching on the Legislature's
> function to decide what the law should be."

The Wrights claim that the legislative history of section

82.008 establishes that the emphasis is upon whether the particular

*defect* claimed was governed by a federal safety standard and not

the risk arising from that defect.  However, section 82.008's

statutory language is clear, and we see no reason to address the

legislative history as urged by the Wrights.[5]  Section 82.008

clearly provides for a rebuttable presumption if the product at

---

[5]Indeed, a closer look at the legislative history indicates that it is not clear that the legislators distinguished between "defect" and "risk." Regardless, the statute says "risk," and if the language of a statute is clear, we do not need to reach legislative history—particularly when the legislative history does not necessarily conflict with the plain reading of the statute.

issue—here, Ford's 2001 XLT Expedition—was manufactured in compliance with federal regulations that "governed the product *risk* that allegedly caused harm." TEX. CIV. PRAC. & REM. CODE § 82.008(a) (emphasis added).

It is a much closer question, however, whether FMVSS 111 governed the product risk asserted in this case. The risk that caused the harm and forms the basis of the Wrights' suit is the rear blindspot of the Expedition. Indeed, several times in the Wrights' experts' reports and their lawyer's opening statement to the jury it is asserted that the allegedly defective design feature that caused the tragic accident at issue was the Expedition's "rather substantial blind area behind it" and "there is a huge blind spot behind this Expedition." The testimony of their expert Geoffrey Mahon also reflects that the product risk they asserted was that arising from the unreasonably dangerous blind spot behind the Expedition when it was not equipped with the non-federally required ultrasonic reverse sensing system.

FMVSS 111, last updated in 1998, expressly states that it addresses rear blindspot risks (see note 3, *supra*). On November 27, 2000, the National Highway Traffic Safety Administration (NHTSA) published, under the heading "Federal Motor Vehicle Safety Standard No. 111, 'Rearview Mirrors'; Rear Visibility Systems", an Advance Notice of Proposed Rulemaking (Notice), 65 Fed. Reg. 70,681, that indicated the possibility of amending FMVSS 111 to require further rear visibility systems, such as cross-view mirrors

11

or the ultrasonic reverse sensing system, rear video cameras or other such devices on commercial trucks with a gross vehicle weight of 10,000 pounds or more to reduce pedestrian deaths caused by backing vehicles.

In a passing comment regarding possible preemption issues, the Notice indicated that NHTSA had previously "stated that the requirements in [FMVSS] 111, 'Rearview Mirrors', do not address the visibility of the area directly and immediately behind a vehicle. Accordingly, Standard No. 111 does not preempt any State from requiring rear cross-view mirrors on vehicles." 65 Fed. Reg. 70,681. The Notice indicated, as well, that a Washington statute requiring commercial vehicles up to 5.5 meters in length to be equipped with driver-warning backup alerts (as urged here for the Expedition) or rear-mounted cross-view mirrors was not preempted by FMVSS 111 due to the afore-quoted NHTSA's interpretation of FMVSS 111.

This *preemption* matter mentioned by the Notice, however, does not conclusively indicate that FMVSS 111 does not govern the product risk of which the Wrights complain. Section 82.008(a) is not limited to preemptive regulations, and, in fact, appears to assume non-preemptive regulations (as compliance with a preemptive regulation would of itself normally be determinative regardless of whether the claimant established under section 82.008(b)(1) that it was "inadequate to protect the public"). *See also* 49 U.S.C. § 301.03(e) (compliance with federal motor vehicle safety standards

12

under 49 U.S.C. § 301.01 "does not exempt a person from liability at common law"). However, the statutes and measures mentioned by the Notice address entirely different issues than the one present here—such as Washington's statute requiring the additional blindspot-reducing equipment on large commercial vehicles. Also, FMVSS 111 has a section discussing requirements of motorcycles and passenger cars under the weight of the 10,000-pound vehicles addressed by the November 2000 Notice. Indeed, the Notice specifically says that reverse sensing systems installed on passenger vehicles are, as the technology stood as of the date of the Notice, of questionable help in terms of detecting people in the vehicles' blind spots.[6] The Notice states that rear sensing systems are "relatively expensive technologies that do not presently reliably detect pedestrians" and that "there are not yet commercially available systems that can reliably detect pedestrians and children to the rear of the vehicle." 65 Fed. Reg. 70,681. The Notice then continues on to limit its applicability, stating: "The agency [NHTSA] will reevaluate the need for and practicability of means of avoiding fatal backing crashes as technology progresses and performance is improved. However, public comment is specifically invited on the agency's current intentions of limiting

---

[6]The Notice states:
"Several commonly used vans and passenger cars are now available with optional rear object detection systems that are advertised and intended for use as parking aids—not pedestrian detectors. Ford, GM, BMW and Mercedes-Benz have devices that are claimed to reliably detect when the vehicle is about to back into a pole, but not when it is about to back into a person." 65 Fed. Reg. 70,681.

13

the requirements [of cross view mirrors] to straight trucks with a GVWR between 10,000 and 26,000 pounds."[7] *Id.* The federal agency chose to not even pursue amending FMVSS 111 to require such systems on passenger vehicles because it concluded that the ultrasonic reverse sensing systems were not yet sufficiently reliable to detect pedestrians. The goals were admirable but the technology was simply not there yet.

Indeed, the fact that the November 2000 proposal centered upon amending *FMVSS 111* to address the same risk of which the Wrights complain *in a similar manner as they suggest* is a further indication that this federal regulation governs the risk that allegedly caused the harm. This is sufficient to come within section 82.008. The product risk addressed by FMVSS 111 is and was that of "deaths and injuries that occur when the driver of a motor vehicle does not have a clear and reasonably unobstructed view to the rear." When consideration was given to further expanding the vehicle requirements to meet this risk, the November Notice addressed *amending FMVSS 111* to expand *its* requirements designed to address that same risk. So far as applicable to passenger vehicles, it was decided *not* to impose additional requirements to address that risk, *because* the technology was not then available. As to such vehicles, *that product risk* would be governed by, and only by, the requirements of FMVSS 111 as it then stood. The 2001

---

[7]The vehicles forming the topic of the Notice are over twice as large as the some 4,000-pound Expedition.

14

Ford XLT Expedition met those requirements. As to the larger vehicles, further consideration would be given to amending *FMVSS 111* to add further requirements addressing that same product risk. We hold that FMVSS 111 applies to the product risk asserted in this case. Accordingly, the Wrights' objection to the jury charge on the basis that FMVSS 111 did not so apply was properly overruled by the district court.

(b) The Wrights next argue that even if FMVSS 111 sufficed to trigger the presumption provided by section 82.008, they rebutted that presumption because they produced at trial some evidence that would support a jury finding that the standard was inadequate to protect the public from unreasonable risk of injury or damage. Therefore, they argue the presumption should not have been included in the jury instructions at all. We decline to find reversible error on this issue.

The Wrights did not object to the jury instruction on this ground at trial—they only objected on the grounds previously addressed, that FMVSS 111 did not govern the defect asserted.

"A party may not object to an instruction on one ground at trial and then attempt to rely on a different ground on appeal." *Coastal Distributing v. NGK Spark Plug Co.*, 779 F.2d 1033, 1039 (5th Cir. 1986). *See also, e.g.,* 9A Wright & Miller, Federal Practice and Procedure: Civil 2d § 2554 at 426 ("A party may not state one ground when objecting to an instruction to the jury and attempt to rely on a different ground for an objection on appeal or

15

on a motion for a new trial"). Where a claimed ground of instructional error raised on appeal was not properly preserved below we may reverse *only* for "plain error," which requires not only error, but also that the error "was clear or obvious," that "substantial rights were affected" *and* that, consistent with our discretion whether to correct any plain error, "'not correcting the error would seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" *Texas Beef Group v. Winfrey*, 201 F.3d 680, 689 (5th Cir. 2000) (citations omitted). *See also, e.g., Rizzo v. Children's World Learning Centers, Inc.*, 213 F.3d 209, 213 (5th Cir. 2000) (en banc). The plain error standard is not met here.

To begin with, it is by no means "clear or obvious" that the mere introduction of evidence which would *support* (though not legally compel) a factual finding that the applicable federal standards (here, those of FMVSS 111) "were inadequate to protect the public from unreasonable risks of injury or damage" (as provided in section 82.008(b)(1)) suffices of itself to rebut the "rebuttable presumption" established under section 82.008(a) and cause that presumption to "disappear" from the case so as to be an improper subject of jury instruction.[8] It is true that under Texas

---

[8]We assume, *arguendo only*, that the evidence suffices to support a finding that the standards of FMVSS 111 "were inadequate to protect the public from unreasonable risks of injury or damage" in respect to the product risk here at issue. However, we hold that the evidence in this respect does *not* establish any such inadequacy as a matter of law; on the evidence here the presence of any such inadequacy would be at most a fact question.

We further note that there is no evidence (and neither side has contended

16

law presumptions are "generally" treated as being of the so called "Thayer" variety, namely presumptions which shift only the burden of production of evidence, which "disappear" from the case once evidence is introduced sufficient to support a finding contrary to the presumed fact, and which do not shift the burden of persuasion. *See, e.g., General Motors Corp. v. Saenz*, 873 S.W.2d 353, 359 (Tex. 1993) (common law "presumption that adequate warnings on products will be headed").   However other Texas presumptions – often referred to as "Morgan" presumptions – do not so disappear and do operate to shift the burden of persuasion.  *See, e.g., Trevino v. Ortega*, 969 S.W.2d 950, 953, 960 (Baker, J., concurring) (Tex. 1998); *Bogart v. Somer*, 762 S.W.2d 577 (Tex. 1988); *In Re R.D.Y.*, 51 S.W.3d 314, 321 (Tex. App. Hou. [1st] 2001; pet. denied); *K.B. v. N.B.*, 811 S.W.2d 634, 642 (Tex. App. SA, 1991).  *See also, e.g., Steven Goode et al,* Guide to the Texas Rules of Evidence, 1 Texas Practice Series § 301.2 (2002).[9]

---

that there is) of any misrepresentation to, or withholding by Ford of relevant information from, the federal agency in connection with the relevant safety standards or regulations at issue, as addressed in § 82.008(b)(2).

[9]     "A Thayer-type presumption shifts only the burden of production to the opponent of the presumption. . . . the opponent must produce enough evidence so that a reasonable juror could find the non-existence of the presumed fact.  If the opponent meets this burden, the presumption disappears from the case . . . Thayer-type presumptions . . . are frequently referred to as 'bursting bubble' presumptions . . . . Many courts and scholars believe that the Thayer approach significantly undervalues presumptions . . . . Once led by Professor Morgan, they argue that a presumption should shift the burden of persuasion to the party opposing it. . . . Given both the complexity of the task and the vast and proliferating number of presumptions in Texas, both

17

We have been cited to no Texas appellate court opinion directly addressing this aspect of the section 82.008 presumption (that section applies only to suits filed after September 1, 2003).

Given that the section 82.008(a) presumption is a statutory one, the language of the statute would appear to control its operation. The statute provides that the "claimant may rebut the presumption in subsection (a) by *establishing* that . . . [the applicable federal standards] were inadequate." Section 82.008(b) (emphasis added). "Establish" connotes something more than simply introducing *some* evidence from which a factfinder might – *or might not* – find that which is to be "established." If, as here, the assertedly rebutting evidence is *not* such as to require as a matter of law that the federal standards be held inadequate, but rather presents a fact question in that respect, then, in a jury tried case, it appears logical to conclude that the statute proceeds on

statutory and court-made, any effort to catalog presumptions in an evidence code would be futile. The drafters of the Texas rules were forced to choose between the only two realistic alternatives: either opt for one approach to presumptions to the exclusion of the others or leave the matter to the courts for a case-by-case consideration. They chose the latter. Consequently, the Texas Rules of Evidence say nothing about presumptions; Article III is left blank. The effect of any presumption must be determined by looking to the relevant case law and statute, if any.

Many presumptions in Texas are given the minimal, Thayer-type effect. Indeed, it has been sometimes said to be the predominant approach to presumptions in Texas. . . . Other presumptions are accorded greater force. Some of these shift the burden of persuasion and can be overcome only if the opponent convinces the jury of the non-existence of the presumed fact by a preponderance of the evidence; still others require the opponent to present clear and convincing evidence." *Id*. at 92, 93, 95, 96 (footnotes omitted).

18

the assumption that any such fact question as *whether* the presumption has been rebutted will be submitted to the jury.

We conclude that it is not "clear or obvious" that the presumption provided for by section 82.008(a) and (b) is a Thayer type – rather than a Morgan type – presumption, and accordingly the Wrights' contention, not properly preserved below, that the trial court erred by failing to treat the section 82.008 presumption as a Thayer-type (rather than a Morgan-type) presumption, does not present any plain error. Further, there is ample evidence (apart from any section 82.008 presumption) to sustain the verdict and certainly no clear indication that the verdict would probably have been different absent the section 82.008 instruction, and accordingly, even if the minimum standards to authorize reversal under the plain error standards were met, we would not exercise our discretion to do so because it does not appear that failure to address the claimed error would seriously affect the fairness, integrity or public reputation of judicial proceedings.

## Summary Judgment: Marketing Defect Claim

Grants of summary judgment are reviewed *de novo*, applying the same standard as the district court. *Tango Transp. v. Healthcare Fin. Servs. LLC*, 322 F.3d 888, 890 (5th Cir. 2003). Summary judgment is proper if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). We view the evidence in a light most favorable to the non-moving party. *EMCASCO Ins. Co. v. American Intern.*

19

*Specialty Lines Ins. Co.*, 438 F.3d 519, 523 (5th Cir. 2006).
Further, in order to avoid summary judgment,

> "the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate, however, if the non-movant 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.' *Celotex*, 477 U.S. at 322-23, 106 S.Ct. 2548." *EMCASCO,* 438 F.3d at 523.

"[A] marketing defect occurs when a defendant knows or should know of a potential risk of harm presented by a product but markets it without adequately warning of the danger or providing instructions for safe use." *Sims v. Washex Machinery Corp.*, 932 S.W.2d 559, 562 (Tex. App.–Houston [1st Dist.] 1995, no writ). To sustain their marketing defect claim, the Wrights had to show the following: (1) a risk of harm inherent in the product or which may arise from the intended or reasonably anticipated use of the product; (2) the product supplier actually knew or should have reasonably foreseen the risk of harm at the time the product was marketed; (3) the product contains a marketing defect; (4) the absence of a warning renders the product unreasonably dangerous to the ultimate user or consumer of the product; and (5) the failure to warn must constitute a causative nexus in the product user's injury. *Id.*

20

In granting summary judgment in favor of Ford on the Wrights' marketing defect claim, the district judge determined there was no evidence of causation, noting that the Expedition's owner's manual presents information on the available reverse sensing system option and on the substantial blind spot behind the vehicle. In finding that no additional or different warning would have caused a different result as to this accident, the district judge mainly relied upon the testimony of the Expedition's purchaser, Darren McCutcheon. Darren McCutcheon testified that when he bought the vehicle, he knew of the vehicle's rear blind spot and knew of the reverse sensing system and its availability. He also testified that when he bought the Expedition, he knew what options he wanted on an Expedition before he set foot in the automobile dealership—it did not matter to him what anyone told him or what information was in the manual concerning the reverse sensing system. He was quite clear in saying he would have bought the vehicle without the reverse sensing system no matter what warning he had then received.

Under Texas law, there is a presumption that an adequate warning would have been followed.[10] The presumption, however, is a Thayer-type presumption which disappears if evidence is presented that the warning would not have been followed. The burden then

---

[10]We will assume arguendo that this common law presumption applies in a case such as this where a third party is the plaintiff and not the purchaser. *See, e.g., Khan v. Velsicol Chemical Corp.*, 711 S.W.2d 310, 317 (Tex. App.—Dallas 1986, writ ref'd n.r.e.).

shifts back to the plaintiffs to show that the warning would have been followed—otherwise the plaintiffs are subject to a directed verdict. *General Motors Corp. v. Saenz*, 873 S.W.2d 353, 359 (Tex. 1993). And, "[t]here is no presumption that a plaintiff" . . . or, presumably, other person . . . "who ignored instructions that would have kept him from injury would have followed better instructions." *Id*. at 359.

We agree with the district court's grant of summary judgment. Ford presented evidence through the testimony of the McCutcheons that they would not have heeded any warning if presented. To survive summary judgment, the Wrights had to present evidence that the purchasers would have bought the reverse sensing system option if they had been warned—a burden the Wrights did not satisfy here. We affirm the district court's grant of summary judgment to Ford on this claim.

## Expert Testimony Rulings

We review district court rulings on the admission of expert testimony for abuse of discretion. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 274 (5th Cir. 1998)(en banc).

*1) Expert witness for the Wrights*

The district judge excluded certain testimony from the Wrights' primary expert witness, Dr. Geoffrey Mahon, who was brought to testify that had the Expedition been equipped with the reverse sensing system, it would have more likely than not prevented the accident that claimed the life of Cade Wright.

22

Specifically, the district judge excluded from evidence "sanity testing"[11] conducted for Mahon by The Irwin Company, an accident reconstruction company, that attempted to show that an Expedition equipped with the reverse sensing system would have detected Cade Wright and alerted Robin McCutcheon to his presence in her vehicle's blind spot. To conduct this test, Irwin located a person who owned an Expedition equipped with the reverse sensing system, traveled to their home with his three-year-old nephew, and tested the system by placing his nephew in various positions behind the Expedition to test its response.

As a result of the exclusion of Irwin's tests, Mahon was not allowed to testify about the results of the tests or its role in shaping his expert opinion. According to the Wrights, this allowed Ford's attorneys to cross-examine Mahon "aggressively" concerning his lack of testing conducted by him personally supporting his theory that the reverse sensing system was capable of detecting a three-year-old child, creating the impression for the jury that his theory was without basis and easily disregarded.

The Wrights have not provided us with a record upon which we may determine whether or not the exclusion of Irwin's tests was an abuse of discretion. Our past decisions have clearly indicated

---

[11]As clarified at oral argument, "sanity testing" is an engineering term used to describe basic testing conducted to test the performance of a system in real-world situations. However, the "sanity testing" conducted in this particular instance was adjudged to be of such poor, chaotic quality it led the district judge to call it an "insanity" test due to it having "more of an insanity kind of environment than a sanity."

23

that "'excluded evidence is sufficiently preserved for review when the trial court has been informed as to what counsel intends to show by the evidence and why it should be admitted, *and this court has a record upon which we may adequately examine the propriety and harmfulness of the ruling.*'" *Dell Computer Corp. v. Rodriguez*, 390 F.3d 377, 387 (5th Cir. 2004) (emphasis added) (quoting *United States v. Jimenez*, 256 F.3d 330, 343 (5th Cir.2001) (noting that "[t]he latter rule has particular force when the trial court makes clear that it does not wish to hear further argument on the issue.")). The Wrights failed to include in the record to this court any documentary evidence of the tests. Irwin made no written notations of the results of his tests and reported the results of the sanity testing to Mahon over the telephone in an unrecorded conversation. The only documentation of the tests consists of a series of photographs and a home video with such poor sound quality that wind noise apparently blocked the sound of the sensors alerting to detection of objects (and a child) placed in the vehicle's blind spot. Furthermore, even if the sensors could be heard in the video, it appears that the position of the camera made it impossible to gauge distances. Alas, none of this documentary evidence was included in the appellate record for us to review ourselves to adequately examine the propriety of the trial court's ruling.

The manner in which the tests were performed, as disclosed in the video documentation of the testing, which was before the

district judge but has *not* been included in the record on appeal, left the district judge so incredulous as to state, "I think my daughter's high school science fair projects are more scientific than this . . . ." Indeed, after viewing the video documentation of the test, the district judge described it by saying, for example: "to say I wasn't impressed is an understatement"; "It wasn't at all the quality experiment that I would expect"; "it just didn't seem to pass the scientific smell test to me"; "my children and I could have done this test and we could have made it look better . . . my husband could do better"; the video "is, in my estimate, an embarrassment to the scientific community . . . not scientific at all . . . totally unscientific"; and, finally, "That's not a scientific piece of documentation, in my opinion."

Nothing in the record before us allows us to conclude that the district court abused its discretion in excluding the results of this testing or opinions based thereon. We affirm the district court's exclusion of Irwin's sanity testing.

*2) Expert witness for Ford*

Ford retained expert witness Dr. Michelle Vogler to testify regarding the relative safety of the McCutcheon's 2001 Expedition in order to contest the Wrights' claims that the Expedition was unreasonably dangerous when not equipped with a reverse sensing system. The Wrights argue that the district court erred by allowing Vogler to testify regarding the blind spots of vehicles not substantially similar to the McCutcheon's Expedition, including

25

vehicles manufactured after the vehicle in question. The Wrights contend this testimony was "unfairly prejudicial and harmful," and comparing the blind spot of the McCutcheon's 2001 Expedition to those of cars manufactured in 2004 "gave the jury the improper and erroneous evidence that the 2001 Expedition compared favorably with other vehicles manufactured in 2001."

Vogler testified that the 2001 Expedition's rear blind spot was not unusually large when compared to many passenger cars, sold in 2001 and after. The point of the expert testimony was to present evidence that countered the Wrights' conclusory allegations that the 2001 Expedition's blind spot was unreasonably dangerous due to being unusually large. We see no abuse of discretion in the district judge's admission of this testimony, and we accordingly reject appellants' complaint in this respect.

## Conclusion

For the foregoing reasons, the judgment below is affirmed.

AFFIRMED.

26