# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 26, 2013

Lyle W. Cayce
Clerk

No. 11-20636

DONALD EUGENE BOYD; CHARLES PRIBILSKI, also known as Jimmy
Olson,

Plaintiffs-Appellees-Cross Appellants

v.

CITY OF HOUSTON, TEXAS,

Defendant-Appellant -Cross Appellee

R.M. CASHDOLLAR, as HPD Officer Sergeant and Individually; HPD Officer
RODOLFO TREVINO, Individually,

Defendants - Cross-Appellees

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:08-CV-2947

Before STEWART, Chief Judge, and HIGGINBOTHAM and JONES, Circuit
Judges.

PER CURIAM:[*]

When a city's action violates constitutional rights, victims of that action
may seek relief under 42 U.S.C. § 1983, but § 1983 does not impose vicarious
liability. The city may be held liable only for its own actions. This is black letter

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

law. Because the district court inadequately conveyed this critical point to the jury, we VACATE the judgment entered against the City of Houston and REMAND for further proceedings. At the same time, we AFFIRM the judgment in favor of two police officers exonerated by the jury.

## I.

The Pink Monkey was a nightclub in downtown Houston. Police were concerned that the club, though open legally, was selling alcohol to underage patrons, selling alcohol later at night than was lawful, and tolerating the open-air use and sale of narcotics. The Pink Monkey had also been the site of violence. Patrons had reported being drugged there, and in May 2007, at least two were shot.

This case arises from a May 2008 raid of the club. The raid was conducted by an After-Hours Task Force, "a group that was pulled together from various divisions throughout the [Houston Police] Department as needed to address criminal activity in the after-hours nightclubs." Members of the Task Force were briefed and shown a PowerPoint presentation. The presentation instructed that roughly 500 people were expected to be in the club, 200 of whom would be intoxicated. Although the presentation explained that "people outside the club" should be permitted "to leave the area," it also advised a "Perimeter Team" to "[e]stablish a safe perimeter" and "[m]ake arrests."

At around 3 a.m. on the scheduled day of the raid, Donald Boyd and Charles Pribilski were seated outside the Pink Monkey. Boyd suffered from lupus, a disease with which he had been diagnosed when he was around twenty-eight years old. The lupus caused a stroke, leaving his "right side partially paralyzed."[1] Working for the Pink Monkey despite his disabilities, he watched the "door guy" to ensure that he was not pocketing money. Pribilski sat next to

---

[1] Boyd also had a pump implanted in his stomach, which distributed "a constant flow of [medication] . . . throughout [his] spine."

Boyd, his friend of nearly two decades. Earlier in the evening, Pribilski had been promoting the Pink Monkey by doing a live broadcast for a local radio station. The two were discussing music when Pribilski saw a burst of light.

The raid was on. Officers streamed toward the club. Pribilski and Boyd remained seated. Pribilski testified that he "was stunned": "[J]ust in shock, I didn't know what was going on." Boyd thought police might be "going after a wanted criminal or something." The record is unclear whether they understood what was happening, but clear that they did not remain seated. According to Pribilski, an officer asked another officer what to do about Boyd and Pribilski. Sergeant Reid Cashdollar then grabbed Boyd and—in Cashdollar's words—"[a]ssisted him to the ground."

Boyd said: "slammed." Unable to break his fall, Boyd screamed in pain as he hit the pavement.[2] Pribilski testified that he dropped to the ground and assisted his friend, and that he was further pushed to the ground, bound with zip ties, and detained for roughly thirty minutes. Boyd was handcuffed by Officer Trevino and detained for about fifty minutes. According to Boyd and Pribilski, officers reached in their pockets while they were detained.

Boyd and Pribilski filed this § 1983 action in federal district court,[3] as amended, alleging that the City of Houston, as well as Officers Cashdollar and Trevino, violated the plaintiffs' Fourth Amendment right "to be secure in their persons . . . against unreasonable searches and seizures."[4] It also claimed that the City "has a custom, policy, practice, and procedure of detaining people without reasonable suspicion or probable cause."

---

[2] Boyd hit the medical pump implanted in his abdomen.

[3] Plaintiffs correctly alleged that jurisdiction was proper under 28 U.S.C. § 1331. Jurisdiction was also proper under 28 U.S.C. § 1343(a)(3).

[4] U.S. CONST. AMEND. IV.

At trial, the parties disputed the basis for the officers' actions. Sergeant Cashdollar claimed that within a two-second period, he told Boyd "[g]et on the ground; get on the ground," but did not point at the ground, took "two steps" toward Boyd, and "[a]ssisted him to the ground" when Boyd did not comply.[5] Boyd acknowledged that officers were shouting "[o]n the floor, on the floor," but testified that, before he was touched, no officer said anything to him—and that, in any event, he could not have moved to the ground within two seconds. Cashdollar also thought Boyd and Pribilski might be club employees—some of whom were suspected of being involved in illegal activities.[6] Both Sergeant Cashdollar and Officer Trevino implied, however, that they did not suspect Boyd or Pribilski of recent criminal conduct, but detained the two because they understood the raid plan to instruct them to detain employees.

Boyd and Pribilski also elicited testimony about the raid plan. Their expert witness, Roger Clark, testified that police should have used non-raid strategies to abate the problems at the Pink Monkey. He also criticized the raid as being understaffed, opined that it "called for quick response and it created an urgency that enhanced the danger unnecessarily," and described other raids that had occurred in years prior.

Kurt Munden also testified about the raid, which took place when he was an Assistant Chief of Police. He claimed that the Task Force had conducted three raids prior to the Pink Monkey raid, each of comparable (but smaller) size, and that other raids had also taken place. Munden did not testify, however, that the Chief of Police was aware of the raids or their details. Similarly, he testified that the Mayor and Chief of Police did not sign the Pink Monkey raid plan and did not review the PowerPoint presentation.

---

[5] A news cameraman also testified that he heard officers yelling, "'Get down, police, get on the floor,' things [of] that nature."

[6] Cashdollar testified that he was suspicious of Pribilski in part because Pribilski was "[t]exting."

The district court instructed the jury that a constitutional violation occurred; specifically, that "search and seizure of the plaintiffs' person was without probable cause and was unlawful and a violation of the Fourth Amendment." The court submitted to the jury the question of the City's liability. The jury found that a "custom, policy, or practice of the City of Houston was a proximate cause of the wrongful acts of the officers against Donald Boyd or Charles Pribilski." It also found that Cashdollar and Trevino did not intentionally commit acts that violated Pribilski's or Boyd's constitutional rights. The district court entered judgment only against the City, awarding damages, costs, and fees. The City appeals, and plaintiffs cross-appeal.

## II.

The City raises several alleged errors in its opening brief. Its most compelling argument is that the district court misinformed the jury concerning § 1983 municipal liability. To demonstrate error, the City must establish "that the charge as a whole creates 'substantial and ineradicable doubt whether the jury has been properly guided in its deliberations.'"[7] "[E]ven if the jury instructions were erroneous, we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case."[8]

Section 1983 provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution."[9] A municipality is a

[7] *Wright v. Ford Motor Co.*, 508 F.3d 263, 268 (5th Cir. 2007) (citation omitted) (internal quotation marks omitted).

[8] *Id.* (citation omitted) (internal quotation marks omitted).

[9] 42 U.S.C. § 1983.

"person" within the meaning of § 1983[10]—one not entitled to Eleventh Amendment or qualified immunity.[11]

A § 1983 plaintiff seeking relief from a municipality "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[12] In other words, "[t]he plaintiff must . . . demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."[13] These requirements are satisfied when a "municipal action *itself* violates federal law, or directs an employee to do so."[14] So, for example, when considering "formal decisions of municipal legislative bodies," "proof that the municipality's decision was unconstitutional" suffices to establish municipal liability.[15] Likewise, when a policymaker "specifically direct[s] the action resulting in the deprivation of" a plaintiff's rights, "[n]o questions of fault or causation" arise.[16]

But when a plaintiff contends that a "facially lawful municipal action has led an employee to violate a plaintiff's rights," he "must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences."[17] "If a [training] program does not prevent constitutional

---

[10] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978) (overruling *Monroe v. Pape*, 365 U.S. 167 (1961)).

[11] *Id.* at 690 n.54 (Eleventh Amendment immunity); *Owen v. City of Independence*, 445 U.S. 622, 638 (1980) (qualified immunity).

[12] *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997).

[13] *Id.*

[14] *Id.*

[15] *Id.* at 406.

[16] *Id.*

[17] *Id.* at 407 (citation omitted) (internal quotation marks omitted).

violations, municipal decisionmakers may eventually be put on notice that a new program is called for" and "[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability."[18]

So long as the municipal policy at issue is facially lawful, the "deliberate indifference" requirement applies even where a plaintiff relies on a "custom," as opposed to a formal legislative act.[19] This because the relevant question then is not whether a municipality is aware of and indifferent to *the existence of a custom*; rather, it is whether the municipality is indifferent "to the risk that a violation of a particular constitutional . . . right will follow" from that custom.[20] This principle complements the principle that a municipality can be held liable if—and only if—it is the entity doing the acting. That is a city may act by directing a facially lawful raid, but absent proof of deliberate indifference, it cannot be held liable for its employees' actions during that raid where those actions are alleged to be due to its custom.

The City contends that the district court's jury instructions failed to charge this "deliberate indifference" requirement. The district court's causation instruction read:

> The plaintiffs must also prove by a preponderance of the evidence that the act(s) or failure to act by the defendant was a proximate cause (cause-in-fact) of the damages the plaintiffs suffered. An act or a failure to act is a proximate cause of an injury or damages if it appears from the evidence that the act or omission played a substantial part in bringing about or actually causing the injury or damages. An act or omission is a proximate cause of the plaintiff's injuries or damages if it appears from the evidence that

---

[18] *Id.* (citation omitted) (internal quotation marks omitted).

[19] *See Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003).

[20] *Bryan Cnty.*, 520 U.S. at 411.

the injury or damage was a reasonably foreseeable consequence of the act or omission.

The relevant interrogatory inquired:

> Do you find by a preponderance of the evidence that any custom, policy, or practice of the City of Houston was a proximate cause of the wrongful acts of the officers against Donald Boyd or Charles Pribilski?

The district court also instructed that:

> The plaintiffs also claim that the City of Houston, through acts or omissions, ratified The After Hours Task Force Operation, . . . thereby sanctioning the conduct of defendant officers. When a plaintiff is deprived of a constitutional right as a result of an "official policy" of a city, the city is liable for the deprivation. Therefore, if you find that the plaintiff was injured as the proximate or legal result of City of Houston's policy, custom, ordinance, regulation or decision, whether made by its lawmakers or by those officials whose edicts or acts may fairly be said to represent official policy, the City itself will be responsible.
>
> In order for a plaintiff to establish this claim, he must prove: (1) a policy or custom existed; (2) the governmental policy makers actually or constructively knew of its existence; (3) a constitutional violation occurred; and (4) the custom or policy served as the moving force behind the violation. You are instructed that the Court finds as a matter of law that a constitutional violation occurred.

Our inquiry begins with whether the relevant City policy was facially lawful and did not direct unlawful action. Reading the charge as a whole as we are required to do,[21] we find that the parties have not identified the "policies or customs" at issue with precision. The jury could have thought the "custom" at issue was one of arresting persons without probable cause. That custom would be facially unlawful—and as an unlawful act of the City, it could give rise to municipal liability.[22] But the jury might also have found the custom to be raiding

---

[21] *See Wright*, 508 F.3d at 268.

[22] The jury might also have thought that the City adopted the Pink Monkey raid plan as one of its policies, and jurors could have understood the raid plan to call for unlawful actions.

clubs suspected of illegal activity. No one disputes the legality of doing or directing that conduct, so the City could be held liable for rights violations during raids only if it was deliberately indifferent to their possibilities. Or the jury might instead have understood the City to have adopted the Pink Monkey raid plan as one of its policies, but understood the raid plan *not* to direct unlawful actions. If the jury did so, then it could hold the City liable for those unlawful actions only if the City was deliberately indifferent to those violations' possible occurrence. Given these possibilities, we are left with "substantial and ineradicable doubt whether the jury [was] properly guided in its deliberations."[23] The jury could have answered "Yes" to the relevant interrogatory without finding the "requisite degree of culpability"[24]—holding the City liable not for the City's actions, but for the unauthorized actions of its employees.

This was a salient weakness in the jury instructions. The plaintiffs elicited testimony concerning raids prior to the Pink Monkey raid, primarily from Roger Clark, who explained:

> [T]here's a four-year history of 26 raids of this type that occurred, and . . . there . . . appears to be a pattern in the department of doing these types of raids which result in unnecessary detention . . . . I totaled the number of detentions that occurred [during those prior raids]. There were a total of 5,496 detentions that occurred in this, in over the period of these four years of 26 raids that appear to occur for hours, people not free to go or to do anything. . . . And . . . this pattern that had been established over this four-year period of these excessive detentions then ended with the Pink Monkey and are reflected in this episode . . . .

A reasonable jury might have been unwilling to infer from that testimony that the City was deliberately indifferent to or directed rights violations, but might have asked how many of those detentions were unlawful, and how many of those unlawful detentions came to the City's attention, and how the City responded to

---

[23] *Wright*, 508 F.3d at 268 (citation omitted) (internal quotation marks omitted).

[24] *Bryan Cnty.*, 520 U.S. at 404.

alleged constitutional violations.[25] While officers testified that they detained plaintiffs in accord with the raid plan, the jury might have concluded that the plan did not call for detentions of this duration—that is, for detentions so long that they transformed into unconstitutional arrests.[26] While the jury may well have had before it sufficient evidence to find the City liable, a matter we do not need to reach and hence do not, we cannot uphold a verdict responding to these instructions. The judgment must be vacated.[27]

We turn to the cross-appeal.

### III.

The district court instructed the jury that defendants' constitutional rights were violated. The jury found that the City was liable for those violations. But the jury also found that Sergeant Cashdollar and Officer Trevino were *not* liable —a verdict that, according to the cross-appeal, was insufficiently supported by the evidence.

The district court charged the jury as follows:

> The fact that the Court has instructed you that the search and seizure of the person of the plaintiffs violated their Fourth Amendment rights does not end the inquiry. The plaintiffs must prove by a preponderance of the evidence that either (1) the defendant officers were plainly incompetent; or (2) that they knowingly violated the law regarding the plaintiffs' constitutional rights. If you find however that the defendant officers were ignorant of the law, or had a "reasonable belief" that they could arrest and search the plaintiffs, then you cannot find them liable even though

---

[25] The jury would have had particular difficulty concluding that the City was deliberately indifferent to the risk of unlawful searches—constitutional violations distinct from the unlawful detentions on which the aforementioned testimony focused.

[26] This theory of liability has another difficulty: it is difficult to impute knowledge of the Pink Monkey raid in particular to the City's policymakers, even if its policymakers were likely aware of a broader custom of raids.

[27] On remand, the district court is free to reconsider its evidentiary rulings and other jury instructions.

the plaintiffs' rights were in fact violated as a result of the defendant officers' conduct.

The district court then posed this interrogatory: "Do you [find] from a preponderance of the evidence that . . . the defendants intentionally committed acts that violated the plaintiff Donald Boyd's federal constitutional right not to be subjected to an unreasonable search of his person or an unreasonable detention?" The court posed a substantively identical interrogatory regarding Pribilski. To both questions, the jury answered, "No."[28]

Plaintiffs contend on cross-appeal that no reasonable jury could have reached this conclusion. Their two-paragraph cross-appeal is limited. Plaintiffs did not object to the district court's instruction that is relevant here, nor do they purport to renew any such objection. They do not contend that, regardless of the evidence, the district court should have decided the qualified-immunity question rather than submitting that question to the jury. Nor do they contend that the district court reversibly erred in admitting certain evidence.[29] Even if the error was preserved, it is without merit.

**\* \* \***

The judgment against the City is VACATED and the cause is REMANDED for further proceedings consistent with this opinion. The judgment in favor of Officer Cashdollar and Trevino is AFFIRMED.

---

[28] The court asked the jury to answer this question with respect to each of Cashdollar and Trevino. Technically, then, the jury answered "No" to four questions—two with respect to Boyd and two with respect to Pribilski.

[29] Indeed, it is only in reply to Cashdollar and Trevino's response to the cross-appeal that plaintiffs claim that, in the district court, they argued that officers were impermissibly permitted to opine about the law.