United States Court of Appeals,

Fifth Circuit.

No. 90–2975.

PARK CLUB, INC., Park Club Ltd., and A. Dalton Smith, Jr., Plaintiffs–Appellants,

v.

RESOLUTION TRUST CORP., In Its Corporate Capacity and as Conservator for MeritBanc Savings Association, Defendant–Appellee.

Aug. 7, 1992.

Appeals from the United States District Court for the Southern District of Texas.

Before KING, SMITH, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

This suit, removed from state court, was brought by two borrowers and a guarantor against a lending financial institution and the Federal Savings and Loan Insurance Corporation (FSLIC), asserting that the lender had failed to abide by its agreement to make a permanent loan and that the FSLIC had interfered with a contractual relationship, and seeking a declaration that the guaranty is unenforceable. The district court granted summary judgment in favor of the defendants. 742 F.Supp. 395. Concluding that summary judgment was inappropriate because of the existence of a factual issue, we reverse and remand.


I.

With the exception of whether a certain letter agreement was approved by the bank's board of directors, the facts are undisputed. MeritBanc Savings and Loan Association ("MeritBanc"), then known as Hardin Savings and Loan Association ("Hardin"), loaned plaintiff Park Club, Inc. ("PCI"), $8,250,000 for acquisition of a tract of land and construction thereon of apartments and a child care facility. This was an interim construction loan evidenced by a promissory note for the same amount and a deed of trust on the property, both executed by PCI, and an assignment of rents.

Plaintiff A. Dalton Smith, Jr., executed a guaranty of the loan. Contemporaneously,

MeritBanc and PCI entered into a letter agreement by which MeritBanc appeared to commit to make PCI a permanent loan to pay off the interim loan. The disputed issue of fact is whether that letter agreement was approved by MeritBanc's board of directors.

MeritBanc subsequently placed itself under the supervisory control of the Texas Savings and Loan Commissioner. Shortly thereafter, the note matured and was not paid, and Smith made no payment on the guaranty. The Texas Savings and Loan Commissioner then placed MeritBanc in conservatorship; the Federal Home Loan Bank Board then appointed the FSLIC as MeritBanc's conservator.

## II.

### A.

In April 1989, PCI, Park Club, Ltd. ("PCL"), and Smith brought suit in state court against MeritBanc for breach of contract and against the FSLIC for interfering with MeritBanc's contractual relationship between and among MeritBanc, PCI, and PCL, and seeking a declaratory judgment that Smith's guaranty was void and unenforceable. The defendants removed the matter to federal court. The Resolution Trust Corporation ("RTC") was substituted for the FSLIC as conservator, and the RTC in its corporate capacity was substituted for the FSLIC in its corporate capacity as defendant.

The plaintiffs alleged that MeritBanc had breached the letter agreement by failing to fund the permanent loan, that MeritBanc had agreed orally to provide either PCI or PCL interim construction financing to construct additional phases of the apartments, and that the FSLIC had tortiously interfered.

The RTC, as conservator, counterclaimed against PCI for the principal, interest, and attorneys' fees due under the note and against Smith pursuant to the guaranty. PCI and Smith answered by asserting their claims for affirmative relief as affirmative defenses.

## B.

The RTC, as conservator and in its corporate capacity, moved for summary judgment, which the district court granted. The court denied PCL's claim for affirmative relief as unenforceable under the *D'Oench, Duhme* doctrine. *See D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). On the same basis, the court denied PCI's claim for affirmative relief and its affirmative defense to liability under the note and Smith's affirmative defense on the guaranty, holding the letter agreement unenforceable under the *D'Oench, Duhme* doctrine. The court denied the plaintiff's tortious interference claims on the ground that they had not met the requirements of the Federal Tort Claims Act. Subsequent to the entry of final judgment, the Office of Thrift Supervision closed MeritBanc and appointed the RTC as its receiver.

## C.

On appeal, the plaintiffs argue that the district court erred in granting summary judgment and assert that they are not estopped to assert their defenses because the note, providing for a variable rate of interest, was non-negotiable. The plaintiffs aver that the requirements of *D'Oench, Duhme* and its companion statute, 12 U.S.C. § 1823(e), have been met. Additionally, the plaintiffs contend that their jury demand was struck improperly and that the district court was in error in establishing a receivership over PCI.

The RTC answers that summary judgment was correct in that no rational trier of fact could conclude that MeritBanc's board had approved the letter agreement and that, as *D'Oench, Duhme* requires such agreements to be recorded and board approval is evidence of recordation, *D'Oench, Duhme* has not been satisfied. In the alternative, the RTC argues that section 8.08(g) of the Texas Savings and Loan Act, TEX.REV.CIV.STAT.ANN. art. 852a, § 8.08(g), requires board approval. The RTC also contends that the jury demand was untimely and that the receivership was justified.

## III.

A.

Recently we reiterated that "[t]he personal defenses to which the maker is entitled must, of course, be based on documents of the savings institution at the time of its insolvency and not upon secret agreements unenforceable under *D'Oench, Duhme....*" *RTC v. Montross,* 944 F.2d 227, 228–29 (5th Cir.1991) (en banc) (per curiam). This requirement applies irrespective of whether the note is negotiable. *Id.* Under *D'Oench Duhme,* agreements, to be enforceable, must be recorded. *FDIC v. Hamilton,* 939 F.2d 1225, 1228 (5th Cir.1991). Section 1823(e)(3) specifies that no such agreement is valid against the RTC unless it was "approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee...."

Section 8.08(g)(3) of the Texas Savings and Loan Act, similarly, provides that during a conservatorship, a prior agreement is unenforceable against a lending institution unless the agreement was approved by the board of directors. Thus, the RTC's defense based upon that section likewise depends upon whether MeritBanc's board approved the letter agreement.

B.

The critical issue, then, as we have said, is whether the letter agreement promising permanent financing was approved by MeritBanc's board of directors. In the posture of this case, the question of law before us is whether the plaintiffs presented sufficient summary judgment evidence to create an issue of fact so as to defeat the motion for summary judgment.

The plaintiffs rely in part upon the deposition testimony of Douglas Gwin, a former employee of MeritBanc who was in charge of coordinating the documentation for the loan, based upon the loan committee's instructions. He testified that "[t]here was a permanent loan commitment of some sort" and that James Cauley, MeritBanc's Executive Vice President, had drafted and signed it. He stated that he did not know whether the letter agreement had been approved by the board or whether it was

part of the loan package that was presented to the board for approval.

The plaintiffs place more reliance upon Cauley's deposition testimony. Cauley was a member of the loan committee. He stated that meetings of the loan committee were both formal and informal and that loans were approved by the signature of three committee members. Once the loan committee had recommended or approved a loan, the board "basically ratified at the monthly meetings the action of the loan committee." He described this as ratifying or approving the loans "in retrospect." He testified further that there was not a separate system of approving a commitment associated with a loan but that the board would have been informed of the existence of the commitment at the time the construction loan was made.

Thus, the practice was to inform the board, when the construction loan was to be considered, that a permanent loan commitment had been issued in connection therewith. So, in the ordinary manner of handling loans at MeritBanc, the approval of the construction loan would have encompassed both the construction loan and the permanent loan commitment.

Thus, Cauley concluded, the board's approval of the interim loan included approval of the permanent loan commitment. His reasoning was that, as a matter of common sense, before the board would have approved such a sizable loan, it would have required knowledge of how the loan was to be taken off the association's books when construction was completed; therefore, in the ordinary course of business, when the construction loan was considered and approved, the permanent loan would have been considered and approved, as well. Cauley added that no new funds were required to close the permanent loan commitment and that closing the permanent loan would have required nothing more than preparing new documents in the form of a permanent loan and checking for any new liens.

The minutes of MeritBanc's executive committee, dated January 23, 1989, approximately one

month after the loan matured, show the following:

> ... Mr. Cauley advised the Park Club package is being prepared to send to the Federal Home Loan Bank, [sic] this commitment expired December 31, 1988; however, we received a request in November to either fund the permanent loan or provide additional construction financing. The Association is to obtain a legal opinion that the permanent loan is a bonafide [sic] commitment.
>
> . . . . .
>
> Mr. Cauley advised that Park Club, Inc., $1.8 million loan, is saying there is a commitment outstanding for the permanent loan. He added that the commitment for the permanent loan included language which put the commitment contingent on regulatory restrictions.

The commitment referred to is in the form of a letter on Hardin's stationery, dated June 30, 1987, addressed to Smith of Park Club and signed by Cauley, stating that "[t]his letter evidences the commitment of Hardin ... to make a loan to Park Club, Inc. ... for a permanent first lien mortgage loan in the amount of $8,250,000.00 to refinance the construction loan on Park Club Community Apartments." On October 14, 1988, Smith wrote Cauley requesting the closing of the permanent loan. On November 3, 1988, Cauley wrote an attorney, asking for preparation of permanent loan documents and stating, "MeritBanc Savings Association is prepared to fund a first lien mortgage in the form described below...."

As we might expect, the RTC relies upon other evidence in the summary judgment record. It observes that the minutes of the August 19, 1987, board meeting, under "Details of Loans Closed," show the terms of the Park Club interim loan but make no mention of the permanent loan or permanent loan commitment. The RTC notes that Cauley testified in deposition that he could not recall the letter agreement's having been discussed at that meeting and never testified that the board in fact had approved that agreement. Moreover, on the same page reflecting the Park Club construction loan, the minutes list other permanent loans closed, without mention of the Park Club commitment.

C.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)). As this is a matter of law, we do not defer to the district court but apply the same standard to the summary judgment record as did the district court. *See Hamilton,* 939 F.2d at 1228.

The district court appears to have based its conclusion, i.e., that the board never approved the permanent loan commitment, primarily upon an evaluation of whether Cauley's testimony sufficiently establishes the board's custom and routine practice. The court concluded that there was no showing of systematic conduct and that "[e]ven if the Board had a practice of specifically not approving loans based on their categorization, the evidence before this Court indicates that on the date in question, the Board departed from the routine" of "specifically not approving loans based on their categorization" by listing approved loans as either interim or permanent.

All this shows, however, is that there is a dispute as to what the normal procedures of the board were and whether, on the occasion in question, those procedures were followed. We agree that on the basis of the evidence heretofore presented, the RTC appears to have the better side of the case: On their face and standing alone, the board minutes are compelling, and their plain meaning appears to indicate that no permanent commitment was approved. Cauley's testimony calls that into question, albeit just barely.

Although it is a close question, we cannot say that, under the *Matsushita* standard, a rational trier of fact *could not* find that the permanent financing was approved. We also are mindful that at trial presumably there would be other evidence, subject to the credibility determinations of the factfinder, that would bear on this issue. The plaintiffs have presented enough evidence on summary judgment to afford them that opportunity at trial.

## IV.

Because we remand for trial on the question of board approval, we now must address the question of whether the district court erred in striking plaintiff's jury demand. The plaintiffs made no jury demand in state court and filed their demand in federal court almost ten months after removal, long after the ten days permitted by FED.R.CIV.P. 81(c). The RTC concedes that the demand was timely as to its counterclaim but argues that the jury should be empaneled only as to the issues raised in the counterclaim.

The parties agree that the test for determining whether a request for a jury on the counterclaim entitles a party to a jury on the complaint is whether the counterclaim is compulsory, i.e., "arises out of the subject matter of plaintiff's legal claim." 5 James W. Moore et al., MOORE'S FEDERAL PRACTICE ¶ 38.39[2], at 38–367 (2d ed. 1992). The parties also agree that the test for whether a counterclaim is compulsory is set forth in *Plant v. Blazer Finan. Servs.,* 598 F.2d 1357, 1360 (5t h Cir.1979): (1) whether the issues of fact and law raised by the claim and counterclaim largely are the same; (2) whether *res judicata* would bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule; (3) whether substantially the same evidence will support or refute plaintiff's claim as well as defendant's counterclaim; and (4) whether there is any logical relationship between the claim and the counterclaim. "An affirmative answer to any of the four questions indicates the counterclaim is compulsory." *Id.* at 1360–61. This standard is taken from FED.R.CIV.P. 13(a), which pro vides that a counterclaim is compulsory if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."

We have little difficulty in concluding that the instant counterclaim satisfies at least the first and fourth tests. The issues of fact and law greatly overlap, and certainly there is a "logical relationship" between the claim and counterclaim. Both regard the same instruments and transactions, and a jury would hear substantially the same facts in regard to both. Accordingly, the district court was in error in striking plaintiff's demand for a jury.

## V.

The plaintiffs complain that the district court appointed an interim receiver to collect and disburse rents until entry of final judgment, after Smith was unable to explain how the apartments and child care center were able to generate a profit but were unable to pay property taxes or debt service. No person ever was appointed as receiver, however, and plaintiffs have not alleged any particular harm from the order that was entered. Thus, to the extent that there is still a live controversy regarding this matter, we affirm the order of the district court, as there appear to have been sufficient grounds for appointment of a receiver.

The district court should not have left the matter in an uncertain status, however. Accordingly, we instruct that on remand, the court should either go forward with appointment of a receiver or vacate its prior order appointing one.

## VI.

In summary, this matter is not appropriate for summary judgment, as any disputed issues of fact must be determined by a jury. The judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED.