# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-60315

United States Court of Appeals
Fifth Circuit

**FILED**

April 2, 2014

Lyle W. Cayce
Clerk

SOMPRASONG SONGCHAROEN, Doctor,

>  Plaintiff–Counter Defendant–Appellee

S. SONGCHAROEN, M.D.,FACS.,P.L.L.C.,

>  Counter Defendant–Appellee,

>  v.

PLASTIC & HAND SURGERY ASSOCIATES, P.L.L.C.,

>  Defendant–Counter Claimant–Appellant

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:11-CV-308

Before REAVLEY, PRADO, and OWEN, Circuit Judges.

PER CURIAM:*

Plaintiff–Appellee Dr. Somprasong Songcharoen ("Songcharoen") withdrew from his medical practice, Plastic and Hand Surgery Associates, PLLC ("PHSA"). Upon withdrawing from PHSA, Songcharoen sued the practice, alleging that under two agreements the parties had signed, he was due a net payment from PHSA. PHSA contended that instead, it was

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-60315

Songcharoen who owed PHSA a net payment.  A jury awarded Songcharoen all of the payments he sought, but also awarded PHSA all of the expenses it sought, resulting in a net verdict for Songcharoen of $87,290.  PHSA appealed, raising several issues.   We affirm as to all but one.

## I.  FACTS

In 2001, Songcharoen and several other doctors decided to form PHSA to practice medicine together.  Each physician, including Songcharoen, created his or her own individual PLLC entity, and then the PLLC entities became members of PHSA.  The PLLC entities prepared two contracts (collectively "the Agreements") to govern the rights and obligations of the physicians in the PHSA medical practice.  The first Agreement was the Operating Agreement for PHSA.  Pursuant to the Operating Agreement, each of the physicians served as a Manager of PHSA and was a Member of PHSA.  Each member had an equal membership unit and exercised equal voting rights.  The Operating Agreement set out a formula for determining the price PHSA would pay a terminating physician for his share of the membership upon his exit.

The second Agreement was the Physician Professional Services Agreement ("the Services Agreement").  Each physician had an identical Services Agreement.  Pursuant to the Services Agreement, the physicians agreed to provide professional services to PHSA in exchange for certain payments.

In early 2007, Songcharoen notified PHSA that he intended to withdraw from the practice and terminate his Services Agreement.  PHSA and Songcharoen agreed to an effective termination date of December 31, 2007. The Services Agreement provided for certain termination payments, as set forth in Section 9A:

> 9.     Termination Payments.

No. 13-60315

A.   Amounts. . . . In the event [Songcharoen] continues to practice medicine for profit following either termination by mutual consent pursuant to Section 8.A. or termination upon one year notice pursuant to Section 8.F., the termination payments payable hereunder shall be reduced to **sixty-five percent (65%) of patient accounts receivable for [Songcharoen]'s professional services performed hereunder prior to termination that are actually collected (after reductions for refunds, collection costs or managed care administrative fees) subsequent to termination**, less [Songcharoen]'s individual and common expenses defined in Exhibit B, and it is understood that [Songcharoen] will remain responsible for individual and common expenses for the entire twelve-month period even if [Songcharoen]'s accounts receivable are insufficient to cover such expenses.

(emphasis added).  From the genesis of PHSA to Songcharoen's withdrawal, Songcharoen performed outpatient procedures and surgeries on his patients in PHSA's ambulatory surgical facility, known as the Plastic Surgical Center. Each of Songcharoen's patients received a bill from PHSA and a bill from the Plastic Surgical Center for the services and procedures Songcharoen performed.  The Plastic Surgical Center is a wholly owned subsidiary of PHSA and distributed its net profits to PHSA on a periodic basis.  The net profits from the surgical center's billings and collections were then allocated to PHSA's surgeons, including Songcharoen, in accordance with a formula set out in the Services Agreement which directly tied each physician's share to the procedures he or she performed in the surgical center.

Under the Services Agreement, the surgical center's collections were a component of Songcharoen's compensation during his tenure with PHSA. Upon his withdrawal, as discussed above, Section 9A entitled him to receive 65% of certain accounts receivable accrued in 2007 and earlier, but collected in 2008.  Under the parties' Operating Agreement, PHSA maintained a capital

3

account for Songcharoen, which represented his investment, including capital contributions and undistributed income, in the practice. As discussed below, Songcharoen maintains that the Operating Agreement provided that, upon his withdrawal as a member of PHSA, he would be entitled to the balance of his capital account. The Schedule K-1 tax form PHSA provided to Songcharoen after the close of the books for 2007 reflected that the value of Songcharoen's capital account was $139,971.

PHSA was also required to buy-out Songcharoen's interest—his membership unit—as a member of PHSA. The Operating Agreement specified a formula upon which the membership unit purchase price would be based. When it came time for each party to make payments to the other, the parties disagreed about multiple calculations and payments due to each party under the contracts.

Songcharoen filed suit on December 30, 2010. PHSA filed an answer and counterclaim. Specifically, PHSA contended it was entitled to expenses under Section 9A and "call–time" damages. Regarding call–time damages, the Services Agreement permitted doctors to take "senior status" and thus avoid being "on call" for five years before fully retiring. PHSA alleges that because Songcharoen did not retire in December 2006, he improperly invoked the senior status provision, and thus must pay PHSA back for the value of the "call–time" he avoided for those five years. Specifically, PHSA asserted its call–time claim through claims of breach of contract, misrepresentation, and unjust enrichment.

Both Songcharoen and PHSA filed cross-motions for summary judgment. Both parties also sought declaratory relief that would explain what each party was entitled to under the Agreements. Both insisted the Agreements were

unambiguous, though they disagreed as to what their unambiguous terms were.

PHSA sought summary judgment as to Songcharoen's claim under the Operating Agreement for payment of the amount in his capital account ($139,971) and as to Songcharoen's claims for payment of several categories of compensation under Section 9A. PHSA also sought summary judgment as to its claim for expenses it argued were chargeable to Songcharoen and were to be "set off" against the termination payments owed to Songcharoen. Songcharoen sought summary judgment as to this claim as well. Songcharoen argued that PHSA's claim for expenses was limited to the language of the Services Agreement and that certain expenses PHSA claimed should not be included.

The district court found that the Agreements were ambiguous, and therefore it reserved the issues regarding the interpretation of the Agreements and the parties' respective claims for damages for the jury. The district court granted summary judgment to Songcharoen as to PHSA's counterclaim for call–time damages because it found that the claim was permissive and therefore time-barred. The parties jointly sought reconsideration of their cross-motions for summary judgment. The district court denied the motion for reconsideration and reiterated its findings in another written order.

After a four day jury trial, several issues were presented to the jury for determination. The issues were as follows:

1. What amounts were to be included in the "income" component of the termination payments calculation pursuant to Section 9A of the parties' Agreement? Specifically, was Songcharoen entitled to $43,501, which was 65% of the amount collected by PHSA from facility charges from Songcharoen's patients?

2. Was Songcharoen entitled to $26,115 in ancillary services income collected by PHSA?

3. What amounts should be included in the "expenses" component of the termination payments calculation pursuant to Section 9A of the Services Agreement? Specifically, was PHSA allowed to recover $191,658 in claimed expenses?

4. Was Songcharoen entitled to payment for the amount in his capital account as of December 31, 2007 in addition to the buy-out value of his membership unit?

The jury awarded Songcharoen all the payments he sought, and awarded PHSA all of the expenses it sought, resulting in a net verdict for Songcharoen of $87,290. Thus, the jury accepted some of the positions advanced by each side. PHSA timely appealed.

## II. DISCUSSION

Songcharoen filed suit in Mississippi state court. His original complaint asserted that PHSA had breached two contracts. He also asserted claims for "hostile work environment" and "age discrimination." In light of these claims, PHSA invoked the subject matter jurisdiction of the federal courts under 28 U.S.C. § 1331 and 28 U.S.C. § 1367 and removed the action to the United States District Court for the Southern District of Mississippi. As the district court noted, "[a]lthough Songcharoen's federal law claims were later voluntarily dismissed, the Court may continue to exercise supplemental jurisdiction over the state law claims under Section 1367." This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. Mississippi substantive law and federal procedural law apply to the state law claims. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

## A.     Issue A: Facility Fees

In its first point of error, PHSA argues that the district court erred in denying PHSA's motion for summary judgment and, in the alternative, its motion for judgment as a matter of law as to Songcharoen's claim that he was entitled to a share of facility fees from the Plastic Surgical Center for procedures earned prior to his withdrawal.

In the proceedings below, Songcharoen asserted a claim for a termination payment under Section 9A of his Services Agreement, which the jury awarded him.  Both sides moved for summary judgment, arguing that the Agreements were unambiguous, although the parties disagreed as to the proper interpretation.  The district court denied summary judgment and also denied the parties' joint motion to reconsider.  PHSA argues on appeal that the contract was unambiguous as to whether Songcharoen should receive his share of facility fees, and thus the district court erred by denying PHSA's motions for summary judgment and judgment as a matter of law.  The question of whether a contract is ambiguous is a question of law for the court.  *Texas v. Am. Tobacco Co.* 463 F.3d 399, 406 (5th Cir. 2006).  It is reviewed de novo on appeal.  *Id.*  We address the arguments as to the motion for summary judgment first, and the motion for judgment as a matter of law second.

### 1.  Motion for Summary Judgment

Summary judgment is proper only if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The facts and evidence must be taken in the light most favorable to the non-movant."  *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010) (citations omitted).  However, the Fifth Circuit "will not review the pretrial denial of a motion for summary judgment where on the basis of a subsequent full trial on the merits final judgment is entered adverse to the movant."  *Black*

*v. J.I. Case Co.*, 22 F.3d 568, 570 (5th Cir. 1994); *but see Becker v. Tidewater, Inc.*, 586 F.3d 358, 365–66 n.4 (5th Cir. 2009) (citation omitted) (stating that because Rule 50 motions for judgment as a matter of law are not required following a bench trial, reviewing a district court's denial of summary judgment is appropriate following a bench trial).

> If [motions for judgment as a matter of law] are properly made, the denied motion for summary judgment need not be reviewed, because the "legal" issues determined by the district court are freely reviewable, and the case may be reversed and rendered on that basis.
>
> . . . .
>
> . . . .
>
> . . . To review the pretrial denial of a motion for summary judgment, we would have to review two different sets of evidence: the "evidence" before the district court at pretrial when it denied the motion, and the evidence presented at trial. Of course, the "evidence" presented at pretrial may well be different from the evidence presented at trial. It makes no sense whatever to reverse a judgment on the verdict where the trial evidence was sufficient merely because at summary judgment it was not.

*Black*, 22 F.3d at 571 n.5, 572.  Thus, we decline to consider PHSA's appeal of the district court's denial of summary judgment as to the ambiguity of the Services Agreement.  We instead address the argument that the Agreement was ambiguous through our review of the denial of the motion for judgment as a matter of law.

2. Judgment as a Matter of Law

PHSA seeks, in the alternative, a reversal of the district court's denial of its motion for judgment as a matter of law.  In ruling on PHSA's rule 50 motion, the district court was required to give great deference to and uphold the jury's verdict unless there was no "legally sufficient evidentiary basis" for a reasonable jury to find for Songcharoen.  *See* Fed. R. Civ. P. 50(a)(1); *see also Miss. Chem. Corp. v. Dresser–Rand Co.*, 287 F.3d 359, 365 (5th Cir. 2002). This

Court reviews using the same standard. *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995).

Under Mississippi law, the court must determine whether any ambiguity exists with regard to the terms of the contract. *See Epperson v. SOUTHBank*, 93 So. 3d 10, 16 (Miss. 2012) (citation omitted). In making this determination, "'the intention of the contracting parties should be gleaned solely from the wording of the contract,' and parol evidence should not be considered." *Id.* (citation omitted). "A contract is ambiguous if it is susceptible to two reasonable interpretations." *Id.* at 19 (citations and internal quotation marks omitted). If the district court finds that the contract is unambiguous, it must enforce the contract as it is written. *Id.* at 16; *see also Zumwalt v. Jones Cnty. Bd. of Supervisors*, 19 So. 3d 672, 685 (Miss. 2009) ("An instrument that is clear, definite, explicit, harmonious in all its provisions, and is free from ambiguity will be enforced" as written. (citation and internal quotation marks omitted)).

PHSA argues that Section 9A of the Services Agreement governs the termination payment. Section 9A specifies that a doctor leaving the practice under the conditions Songcharoen left under would be entitled to 65% of "patient accounts receivable for professional Physician's professional services . . . less the Physician's individual expenses." Thus, the parties agree that Section 9A entitled Songcharoen to 65% of his share of PHSA's collected patient accounts receivables, or $31,951.

The parties disagree as to what sources of accounts receivable were to be included in the calculation of the 65%. Namely, Songcharoen says the calculation includes money due both for his clinical services and for surgical center fees billed to his patients resulting from his services prior to his withdrawal. Songcharoen also sought 65% of the *facility fees* collected by the

Plastic Surgical Center from surgeries he performed in the facility, specifically, $43,501.00 (65% of $66,925.00). PHSA argues that the calculation does not include collections from the billings from the surgical center fees from Songcharoen's services.

We affirm the district court's denial of the motion for judgment as a matter of law. Both parties advance a reasonable interpretation. However, the parties failed to define "accounts receivable." Its meaning is open to "two reasonable interpretations" and is thus ambiguous. *See Epperson*, 93 So. 3d at 19 (citation and internal quotation marks omitted). PHSA also briefly argues that the Services Agreement "affirmatively denied" Songcharoen the right to share in profits of the Plastic Surgical Center after he left the practice. The Services Agreement states that to receive compensation from the profits of the Plastic Surgical Center "the Contractor [Physician] shall maintain Class I Membership status and comply with the PHSA Operating Agreement." So, PHSA argues, because Dr. Songcharoen did not maintain Class I Membership, he was barred from recovering facility fees.

This final argument that the Services Agreement affirmatively bans Songcharoen from receiving surgical center fees presents a closer call. But, PHSA does not explain further, and Songcharoen fails to address the argument. The Services Agreement specifies that each physician's compensation for the Plastic Surgical Center's profits would be determined based on the procedures each individual physician performed, which supports Songcharoen's argument that he is entitled to a percentage of the Center's profits due directly to procedures he performed. Ultimately, the Services Agreement does not define "Class I Membership," so it is ambiguous on this point. Thus, as a matter of law, the contract was ambiguous.

Moreover, there was a legally sufficient basis to support the jury's verdict. At trial there was testimony that Songcharoen performed services in the surgical center in 2007. There was also evidence that that each PHSA surgeon who performed services in the surgical center received a portion of facility fees the surgical center collected, and that those fees were allocated amongst the surgeons who performed services based on the number and type of procedures each performed. The key issue for the jury was whether facility fees were to be included as "accounts receivable." Songcharoen points out that PHSA's administrator acknowledged that there "is a direct correlation between the number and types of operations that a particular doctor does and the net that he draws from the profits of the surgery center." The PHSA administrator also acknowledged that Songcharoen would not have generated surgical center fees if he did not perform services in the center. Thus, there was sufficient evidence to support the jury's determination that 65% of the facility fees were due to Songcharoen as part of his termination payment. Therefore, the district court correctly refused to disturb the verdict and properly denied PHSA's motion for judgment as a matter of law.

## B.    Issue B: Ancillary Fees

PHSA argues that the district court erred in ruling that the Services Agreement was ambiguous with respect to whether Songcharoen was entitled to a share of PHSA's income from ancillary services after he left. Thus, PHSA argues that the district court erred by denying PHSA's motion for summary judgment and, alternatively, PHSA's motion for judgment as a matter of law.

Songcharoen sought an award of $26,115 to compensate him for a proportion of the "ancillary income"[1] PHSA generated in 2008. PHSA argued

---

[1] Ancillary income includes profits from skin care treatments and other minor, mostly cosmetic procedures.

before the district court—and argues again before this Court—that the Services Agreement unambiguously fails to provide ancillary income for a physician who leaves the practice. The district court ruled that the Services Agreement was ambiguous with respect to whether Songcharoen was entitled to a share of PHSA's income accrued from ancillary services performed while Songcharoen was a PHSA member, but received in the year following his withdrawal. As above, we decline to review the denial of a motion for summary judgment.[2]　The question of whether a contract is ambiguous is a question of law for the court. *Am. Tobacco Co.*, 463 F.3d at 406. It is reviewed de novo on appeal. *Id.* As to the motion for judgment as a matter of law, we hold that there was sufficient evidence to award Songcharoen his portion of ancillary fees. The contract was ambiguous as a matter of law, *see supra* n.2, and both Songcharoen and his expert testified that including the ancillary income was consistent with the intent of the contract. Thus, we affirm the district court's denial of judgment as a matter of law.

## C.　Issue C: The Capital Account

PHSA next argues that the district court erred in ruling that the Operating Agreement was ambiguous with respect to whether Songcharoen was entitled to the balance of his capital account. The district court found that it was not clear how the two sections of the Operating Agreement were to interact, if at all, and thus the Agreement was ambiguous: "[I]t is not clear from the four corners of the Agreement that Songcharoen's capital interest was

---

[2] In any event, the section of the Services Agreement that PHSA points to is ambiguous. *See Epperson*, 93 So. 3d at 17. PHSA suggests that it means that a withdrawing doctor is not entitled to any further payments. It could also mean that a withdrawing doctor is not entitled to accrue new shares after he leaves, but that he is still entitled to the payments from the prior year that had accrued but not yet been received.

subsumed by his Membership Unit that was purportedly redeemed by PHSA upon his termination." Thus, the district court submitted the issue to the jury. PHSA argues that the district court should have granted PHSA's motion for summary judgment on this issue, or alternatively, PHSA's post-trial motion for judgment as a matter of law.

As discussed above, a denial of summary judgment is not reviewable by this Court after an adverse jury verdict. *See supra* Part II.A.1., *Black*, 22 F.3d at 572. Thus, we only address PHSA's appeal of the district court's denial of its post-trial motion for judgment as a matter of law.

Songcharoen and PHSA's arguments on this issue are the same before this Court as they were before the district court. Both sides again argue that the Agreement was clear and unambiguous, but each side advances a different clear meaning. PHSA maintains that the contract was clear that Songcharoen was entitled only to the "buy-out" price set forth in Section 12.03 of the Operating Agreement. PHSA directed the district court to the mandatory membership redemption provision of the Operating Agreement, Section 12.03. Section 12.03 contains a detailed formula for determining the price to be paid to a departing physician for his membership unit. PHSA's position is that only the formula from Section 12.03 can be considered. PHSA argues that the district court erred in considering the two sections, Sections 7.02 and 6.05, that Dr. Songcharoen had brought to the district court's attention. PHSA argues that Section 12.03, which required PHSA to buy-out Songcharoen's membership unit for the stipulated value of $35,223 subsumed Section 7.02, entitled "Capital Accounts." Thus, for PHSA, Section 12.03, which provides for mandatory redemption of the membership unit, should be read to include Songcharoen's "Capital Interest." Basically, PHSA's position is that a "buy-

13

out" under Section 12.03 takes into account and redeems any balance a terminating physician had in his capital account.

Songcharoen asserts that Section 7.02 of the Operating Agreement provides that, upon his withdrawal as a member, he is entitled to the balance of his capital account. The parties agree that Songcharoen's Schedule K-1 tax forms from 2007 indicate a balance of $139,971. Songcharoen's position is that he is entitled to the "buy-out" amount of $35,223, as calculated from the Section 12.03 formula, as payment for his membership unit, and that separately, he is entitled to the balance of his capital account, per Section 7.02. In sum, for PHSA, the buy-out for the membership unit reflects anything that a withdrawing physician would be due from his capital account. For Songcharoen, the buy-out is separate from anything due to him from his capital account.

We hold that the Operating Agreement is ambiguous as a matter of law, and that thus, the district court did not err in denying PHSA's motion for judgment as a matter of law. Both parties advance reasonable readings of the Operating Agreement. For Songcharoen, Sections 12.03 and 7.02 address different types of payments owed to him upon termination; Section 12.03 provides remuneration for his membership unit, while Section 7.02 reimburses him for the amount in his capital account, as reflected on his Schedule K-1 tax forms. For PHSA, Section 12.03 is the only provision that authorizes payment to a withdrawing physician. PHSA discounts Songcharoen's reliance on Section 7.02 because Section 7.02 addresses payment for liquidating a member's interest, and PHSA insists Songcharoen's interest has not been liquidated. However, the Operating Agreement does not define Liquidation. Because the Operating Agreement is open to more than one reasonable

interpretation, it is ambiguous as a matter of law. *See Epperson*, 93 So. 3d at 17.

PHSA argues that, in the alternative, the jury's verdict is not based on sufficient evidence, and so the district court erred in denying PHSA's motion for judgment as a matter of law. As above, PHSA's arguments before this court are the same as before the trial court.

The standard of review on appeal is described above. *See supra* Part II.A.2. In brief, the district court was required to give great deference to the jury's verdict and uphold it unless there was no "legally sufficient basis" for a reasonable jury to find for Songcharoen. *See* Fed R. Civ. P. 50(a)(1). The standard is the same on appeal. *Hiltgen*, 47 F.3d at 699.

PHSA argues that, assuming the Operating Agreement was ambiguous, because PHSA offered extrinsic testimony as to the parties' intent on the capital account issue, while Songcharoen failed to offer any, the jury verdict is necessarily against the "overwhelming weight of the evidence, and there is no legally sufficient evidentiary basis for it." Thus, PHSA concludes that the district court erred in denying PHSA's post-trial motion for judgment as a matter of law. Songcharoen responds that there is considerable evidence in the record to support the jury's verdict.

Considering all the evidence in the light most favorable to the verdict, there was more than enough evidence from which the jury could find that Songcharoen was entitled to the balance in his capital account upon his withdrawal from the practice. PHSA offered its theory that Section 12.03 was the only avenue through which Songcharoen was entitled to payment. PHSA called two witnesses who testified that the parties did not intend for the Agreement to require reimbursement of a member's capital account upon termination of his membership. While it is true that PHSA presented

testimony from its clinic practice manager that other doctors who had left the practice had not been paid the balance of their capital accounts, Songcharoen also testified that his understanding of the Agreement was that the membership unit and the capital account represented two separate potential payments. Given evidence of two reasonable interpretations of the contract, the jury was free to weigh the evidence, make credibility determinations, and conclude that Songcharoen was entitled to the $139,971 in the capital account. There was more than sufficient evidence for the jury to find for Songcharoen on this issue.

**D.    Issue D: Exclusion of Prior Drafts**

PHSA argues that, if the panel declines to reverse on Issues B or C, in the alternative, the district court erred in excluding PHSA's proffered prior drafts of the Operating Agreement. Specifically, PHSA argues that the district court erred in denying its motion for a new trial on these grounds.

This Court reviews the district court's decision to exclude evidence "under the deferential abuse-of-discretion standard". *Kelly v. Boeing Petrol. Servs., Inc.*, 61 F.3d 350, 356 (5th Cir. 1995). Moreover, "a motion for a new trial based on evidentiary grounds should not be granted unless, at a minimum, the verdict is against the great weight of the evidence, not merely against the preponderance of the evidence." *Carter v. Fenner*, 136 F.3d 1000, 1010 (5th Cir. 1998) (citation omitted). A district court's denial of a motion for a new trial is "generally within the sound discretion of the trial court, and reversible only for an abuse of that discretion." *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982) (citation omitted).

PHSA's argument is as follows: because the district court ruled that the Operating Agreement was ambiguous, the jury was allowed to consider *all* parol evidence beyond the Operating Agreement that illustrated the parties'

intent.  The jury instruction said that "a written contract should be construed according to the obvious intention of the parties, notwithstanding clerical errors or inadvertent omissions therein, which can be corrected by perusing the whole instrument."  The jury was also told that "[i]f a clerical error appears, you may supply the correct word or number *if from the context of the contract*, you can ascertain what word or number should have been used."  (emphasis added).

PHSA called attorney Margaret Williams ("Williams") to testify that there had been a numbering error in the Operating Agreement.  Section 7.02, entitled "Capital Accounts" (discussed in Part II.C. above), stated that if PHSA liquidated a physician's membership unit, then PHSA was to make liquidating distributions "in accordance with Section 6.05."  Section 6.05, in turn, addresses "Distributions in Kind," which, according to Songcharoen, meant that the liquidating payments must be paid in cash, not in kind.

Williams testified before the jury that Section 7.02 was supposed to reference Section 6.04, "Termination of Company," not Section 6.05, "Distributions in Kind."  PHSA then offered into evidence two prior drafts of the Operating Agreement that supported Williams's testimony.  The district court excluded the drafts.  Essentially, PHSA's position is that a cross-reference within the Agreement was not edited correctly before it was signed.[3] Because the district court held that the Agreement was ambiguous, the argument goes, the district court needed to admit all relevant parol evidence.

While the district court could have admitted prior drafts of the agreement, it did not abuse its discretion by not doing so.  *See Royer Homes of*

---

[3] Despite the supposed typographical error, PHSA also maintains that the Operating Agreement was not ambiguous.

*Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 753 (Miss. 2003) (explaining that if the contract is ambiguous, "prior negotiation, agreements and conversations *might* be considered in determining the parties' intentions" (emphasis added)). The jury instruction in the instant case, to which PHSA directs us, does not support PHSA in the way it argues. The jury instruction states, "[i]f a clerical error appears, you may supply the correct word or number if from the *context of the contract*, you can ascertain what word or number should have been used." (emphasis added). PHSA's argument is that the cross-references were wrong; however, that would not be clear from the context of the Operating Agreement, as the jury instruction required. *See also Robinson v. Martel Enters., Inc.*, 337 So. 2d 698, 701 (Miss. 1976) ("If an improper word has been used or a word omitted, the court will strike out the improper word or supply the omitted word if from the context it can ascertain what word should have been used."). The Operating Agreement makes sense as written,[4] so it would not be clear from a plain reading that there was a typographical error.

PHSA's strongest argument is nonbinding federal law. It cites *Dell Computer Corp. v. Rodriguez*, 390 F.3d 377 (5th Cir. 2004), where this Court held that the clause in question was ambiguous, and thus, that the district court erred in excluding parol evidence on the issue. However, the parol evidence rule is substantive, such that we apply Mississippi law, not federal law. *Jack H. Brown & Co., Inc. v. Toys "R" Us, Inc.*, 906 F.2d 169, 173 (5th Cir. 1990) (stating that this Court, when sitting in diversity, applies the parol evidence rule as the state court would); *Rotenberry v. Hooker*, 864 So. 2d 266, 277 (Miss. 2003). Most critically, under Mississippi law, parol evidence is

---

[4] For example, it makes sense not to offer payment in medical equipment.

admissible to explain terms where a document is incomplete. *Epperson*, 93 So. 3d at 17. It cannot be used to contradict the terms. *Id.* Ultimately, PHSA offers no Mississippi authority that states that parol evidence must be admitted to explain a purported typographical error.

Further, PHSA was permitted to introduce some extrinsic evidence via Williams's testimony. Thus, the district court, in the best position to make evidentiary determinations, allowed some evidence that PHSA wanted to introduce and excluded some. That determination was well within the district court's discretion. PHSA's argument relies on a logical flaw. If a document is unambiguous, then no parol evidence can be admitted. PHSA attempts to invert the rule to say that if an agreement is ambiguous than *all* parol evidence must be admitted. Here, the district court did admit extrinsic evidence, Williams's testimony that there was a typographical error. The district court just stopped short of admitting all the evidence PHSA sought to have admitted.

**E.    Issue E: Jury Instruction**

PHSA contends that the district court erred in instructing the jury to construe any ambiguities in the Operating Agreement or Services Agreement in Songcharoen's favor. Based on this contention, PHSA argues that the district court should have granted PHSA a new trial. Songcharoen responds that the jury instructions comported with Mississippi law and were consistent with the evidence presented at trial.

Alleged defects in a district court's jury instructions are reviewed for an abuse of discretion. *Wright v. Ford Motor Co.*, 508 F.3d 263, 268 (5th Cir. 2007). To establish error, the challenging party must show that the instruction as a whole creates "substantial and ineradicable doubt" as to whether the jury was properly instructed. *Id.* (citations omitted).

The jury was told that contracts are to be construed against the party who prepared them, and that because PHSA had drafted the Agreements at issue any uncertainties should be resolved against PHSA and in favor of Songcharoen.  PHSA objects not because the instruction is legally wrong, but because it contends that the evidence at trial showed that Songcharoen had drafted the Agreement as well.  PHSA points out that PHSA is made up of member doctors, like Songcharoen.  Because there was evidence that Songcharoen participated in meetings about the contracts, PHSA argues that the jury instruction did not apply to the facts presented.  As further evidence that the district court abused its discretion by instructing the jury to construe uncertainties in Songcharoen's favor, PHSA reminds the Court that Songcharoen recommended that the group use Williams as a lawyer because he had worked with her in the past.

We hold there was no error below.  PHSA is correct that the rationale of *contra preferentem*, or the principle that ambiguities are construed against the drafting party, is based on the idea that the drafting party is likely to protect his own interest more than that of the other party.  Here, assuming Songcharoen was as actively involved in drafting the Agreements as any of the other doctors, he is not vulnerable to the concerns *contra preferentem* aims to guard against.  However, PHSA cites no controlling law that convinces us that the district court abused its discretion.[5]  Moreover, there was disputed evidence as to how involved Songcharoen was in drafting the Agreements. Additionally, Williams testified that she was PHSA's attorney, and there was no evidence at trial that she represented the doctors' interests, as opposed to PHSA's, during the time the Agreements were drafted.  Ultimately, PHSA has

---

[5] PHSA cites the Delaware Chancery Court, the Eastern District of Virginia, and the Court of Federal Claims.

not convinced us that the instruction created a "substantial and ineradicable doubt."

## F.    **Issue F: Call-Time Damages**

In its final point of error, PHSA argues that the district court erred when it dismissed PHSA's counterclaim for "call–time damages" on the grounds that it was barred by the statute of limitations.  The district court held that PHSA's claims were permissive, not compulsory, and thus they did not relate back to the date of Songcharoen's filing of his action. The question of whether a statute of limitations has run is a legal question that this Court reviews de novo. *Newby v. Enron Corp.*, 542 F.3d 463, 468 (5th Cir. 2008).

In response to Songcharoen's complaint, PHSA asserted a counterclaim against Songcharoen for "call expenses" for the five-year period for which Songcharoen had taken "senior status."  The Services Agreement permits a physician who has been practicing at least fifteen years to take senior status. Any physician doing so would not be required to take be "on call" for nights and weekends for those five years.  After that five year period, the physician is expected to retire.  The district court dismissed PHSA's counterclaim for call–time damages because it deemed the counterclaim permissive, rather than compulsory.  The claim had a three year statute of limitations.  *See* Miss. Code Ann. § 15-1-49.  But because the counterclaim was not compulsory, the district court found, Songcharoen's filing of his complaint did not toll the statute of limitations.   In short, a compulsory counterclaim would be timely, while a permissive one would not.

To determine whether a claim is a compulsory counterclaim, courts should ask:

> (1) whether the issues of fact and law raised by the claim and counterclaim largely are the same; (2) whether *res judicata* would bar a subsequent suit on defendant's claim absent the

compulsory counterclaim rule; (3) whether substantially the same evidence will support or refute plaintiff's claim as well as defendant's counterclaim; and (4) whether there is any logical relationship between the claim and the counterclaim.

*Tank Insulation Int'l, Inc. v. Insultherm, Inc.*, 104 F.3d 83, 85–86 (5th Cir. 1997) (quoting *Park Club, Inc. v. Resolution Trust Corp.*, 967 F.2d 1053, 1058 (5th Cir. 1992)). If any of the four questions results in an affirmative answer, the counterclaim is compulsory. *Id.* The district court conclusorily determined that there was no logical relationship between PHSA's counterclaim and Songcharoen's claims. "[T]he Court finds PHSA has failed to show that its counterclaims . . . would be considered compulsory because there has been no showing that the issue to be decided through these claims . . .[is] . . . logically related to the claims alleged by Songcharoen."

PHSA makes two arguments on appeal in support of its position that its counterclaim was timely. First, PHSA argues that there is a "logical relationship" between the claims because PHSA's counterclaim accused Songcharoen of improperly invoking the senior status term of the Services Agreement—one of the two Agreements under which Songcharoen is suing. Second, the provision of the Mississippi Code that addresses tolling specifies that:

> All the provisions of this chapter shall apply to the case of any debt or demand on the contract, alleged by way of setoff on the part of a defendant. . . . The fact that a setoff is barred shall not preclude the defendant from using it as such if he held it against the debt sued on before it was barred.

Miss. Code Ann. § 15-1-71. So, PHSA urges that even if the statute of limitations on its counterclaim for call–time damages had run, any recovery under that claim could have been used as a setoff pursuant to § 15-1-71.

No. 13-60315

As to PHSA's first argument, a "logical relationship" exists where either "the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the defendants." *Montgomery Elevator Co. v. Bldg. Eng'g Servs. Co.,* 730 F.2d 377, 380 (5th Cir. 1984) (citation and internal quotation marks omitted). We hold that there is a logical relationship between Songcharoen's claims under the Services Agreement and PHSA's counterclaim against Songcharoen for having improperly invoked one of the terms of the Services Agreement. *See Park Club,* 967 F.2d at 1054, 1058 (reversing the district court and stating that a counterclaim for principal, interest, and attorney's fees due under a loan note was logically related to a claim for breach of contract). "Both regard the same instruments and transactions, and a jury would hear substantially the same facts in regard to both." *Id.* at 1058.

Songcharoen mentions that one of PHSA's witnesses testified in his deposition that the Services Agreement did not address the senior status counterclaim. Songcharoen recounts how PHSA's corporate representative, Dr. Stephen Davidson ("Davidson"), stated, in response to a question about what the counterclaim for call–time damages was based on, that the claim was "not based on the contract." However, PHSA correctly points out that Songcharoen mischaracterizes the testimony. For ease of the parties, several PHSA representatives were deposed together. After Davidson's comment, the deposition proceeded as follows: in response to the same question, a second witness, Dr. Wegener said, "He misrepresented." Davidson then added, "that he was going to retire at the end and—". Then, a third PHSA witness, Tammy Burnett ("Burnett") noted, "It does refer to the contract as far as senior status goes." Perhaps Davidson's memory was jogged by this, because he then stated, "He invoked the senior status, which—". To clarify, Songcharoen's lawyer

asked Davidson, "So that's the provision that's based on," and Davidson affirmed, "Correct." The call–time damages claim was based on the same "instrument and transactions, and a jury would hear substantially the same facts in regard to both." *See Park Club*, 967 F.2d at 1058. Thus, the district court erred in determining that PHSA's counterclaim was not logically related and in subsequently categorizing PHSA's counterclaim as permissive, and thus time-barred.[6]

## III.  CONCLUSION

For the reasons stated above, we REVERSE and REMAND the district court's grant of summary judgment as to PHSA's claim for call–time damages. As to the remaining issues, we AFFIRM.

---

[6] Even if we had determined that PHSA's claims were not logically related to Songcharoen's claims, PHSA still contends that the call–time damages would be a setoff. Under Miss. Code Ann. § 15-1-71, a counterclaim that would ordinarily be time-barred by the statute of limitations is nonetheless valid if the right to a setoff existed at the time the plaintiff filed his claim.

Here, the statute of limitations would have run on PHSA's counterclaim for call–time damages on December 31, 2010. But Songcharoen filed his complaint in state court on December 30, 2010. Thus,

[t]he defendant in this case held his several items of setoff against the debt sued on before they were barred by the statute of limitations, and the fact that the defendant's items of setoff may have been barred by the statute of limitation at the time the plea of setoff was filed did not preclude the appellant from using the items as a setoff against the debt sued on.

*Gerald v. Foster*, 168 So. 2d 518, 524 (Miss. 1964) (citation omitted); *see also Singing River Mall Co. v. Mark Fields, Inc.*, 599 So. 2d 938, 944 (Miss. 1992) ("[T]he defendant is not barred from using setoff as a defense to a debt if the defendant held the setoff against the debt sued on before the setoff was barred." (alteration, citation, and internal quotation marks omitted). Thus, even if we had concluded that the claims are not logically related, Mississippi law provides that because any call–time damages would have acted as a setoff, PHSA was permitted to bring them.