# Supreme Court of Texas

No. 21-1097

American Honda Motor Co., Inc.,

*Petitioner*,

v.

Sarah Milburn,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

JUSTICE DEVINE, joined by Justice Boyd, dissenting.

Under Texas law, a product manufacturer is presumed not liable for injuries caused by a design defect when the design complied with applicable federal safety standards governing the alleged product risk.[1] But the Legislature expressly made this statutory presumption "rebuttable," entrusting our juries—not federal bureaucrats—to ultimately determine whether federal safety standards adequately protect Texas citizens. One way a plaintiff can rebut the presumption is to establish that the relevant standards "were inadequate to protect

---

[1] TEX. CIV. PRAC. & REM. CODE § 82.008(a).

the public from unreasonable risks of injury or damage"; nothing more, nothing less.[2]

In this case, the jury found that (1) Honda designed an unreasonably dangerous detachable seatbelt system that caused a young woman to be clotheslined in a car crash, resulting in quadriplegia paralysis, and (2) the federal safety standard that greenlighted this design was inadequate to protect the public from unreasonable risks. The Court nevertheless overturns the jury's verdict. In doing so, the Court measures the evidence of the standard's inadequacy against newly crafted requirements that are not only extra-textual but also unduly deferential to the federal bureaucrats' decision-making process, which only sets forth the "bare minimum" standards for selling a vehicle.

I respectfully dissent and would affirm the jury's verdict. When the evidence is considered in light of the statute's plain language, which the charge tracked, it is legally sufficient to support the jury's express finding that the relevant federal safety standard was inadequate to protect the public. But even if the Court's newly adopted hurdles were proper, this grievously injured young woman should—at the very least— be given a fair opportunity to clear them. The Court's unwillingness to remand for a new trial suggests an awareness that these statutory embellishments would be impossible to satisfy, which effectively converts the legislatively mandated "rebuttable" presumption into one that is conclusive.

---

[2] *Id.* § 82.008(b)(1). Alternatively, the plaintiff may rebut the presumption by establishing that the manufacturer "withheld or misrepresented information or material" relevant to the federal government's adequacy determination of the safety standards at issue. *Id.* § 82.008(b)(2).

**I**

In construing statutes, the starting point must always be the text: "the alpha and the omega of the interpretative process."[3] Section 82.008(a) of the Texas Civil Practice and Remedies Code creates a "rebuttable presumption" that a product manufacturer is "not liable" for injury caused by a product design if the manufacturer establishes (1) the "design complied with mandatory [federal] safety standards or regulations" that (2) were "applicable to the product at the time of manufacture" and (3) "governed the product risk that allegedly caused the harm."[4] If a manufacturer meets this burden, Section 82.008(b)(1) allows the claimant to rebut the presumption by establishing that "the mandatory federal safety standards or regulations applicable to the product were inadequate to protect the public from unreasonable risks of injury or damage."[5]

Belying the statutory text, the Court adopts a new rule requiring a plaintiff to establish one of two limited options to demonstrate a standard's inadequacy and rebut the presumption of nonliability:

> (1) the agency's *decision-making* in enacting the standard was either arbitrary or capricious—a highly deferential standard—or lacked "cogen[cy]" in light of a "comprehensive

---

[3] *BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86 (Tex. 2017).

[4] TEX. CIV. PRAC. & REM. CODE § 82.008(a).

[5] *Id.* § 82.008(b)(1). For purposes of this analysis, I assume that Honda adduced sufficient evidence to invoke the statutory presumption.

3

review of the various factors and tradeoffs . . . considered in adopting that safety standard,"[6] or

(2) *post-approval* developments rendered the safety standard no longer adequate to protect the public.[7]

If not, according to the Court, "neither we nor a jury can deem a particular regulation 'inadequate' to prevent an unreasonable risk of harm to the public as a whole."[8]

But nothing in the statutory text so restrictively circumscribes the jury's role in determining this question of fact.[9] "When decoding statutory language, we are bound by the Legislature's prescribed means (legislative handiwork), not its presumed intent (judicial guesswork)."[10]

---

[6] *Ante* at 29 (citing *Nat'l Truck Equip. Ass'n v. NHTSA*, 711 F.3d 662, 669 (6th Cir. 2013), which applied an "arbitrary and capricious" standard of review to invalidate federal agency action under the Administrative Procedure Act), 29-33 (requiring extensive evidence of "the various considerations" the federal agency "must take into account in making regulatory determinations" and a "comprehensive review of the various factors and tradeoffs").

[7] *Id.* at 33-34 (noting that "subsequent developments," including "a material change in technology or a proliferation of new studies or data about risks and injuries associated with a compliant product," could demonstrate a standard's inadequacy).

[8] *Id.* at 33. Although the Court denies limiting the rebuttal grounds to only two stated options, the Court fails to identify any others. *See id.* at 34 n.23; *infra* at note 60 and accompanying text.

[9] *See Kim v. Am. Honda Motor Co.*, 86 F.4th 150, 170 (5th Cir. 2023) ("[W]hether the presumption has been rebutted is a question of fact for the jury."); *Wright v. Ford Motor Co.*, 508 F.3d 263, 274 (5th Cir. 2007) (noting that it is "logical to conclude" from the statutory language that whether the presumption has been rebutted is a fact question for the jury unless inadequacy is established as a matter of law).

[10] *BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86-87 (Tex. 2017).

According to the statute's plain language, manufacturers are entitled to rely on the federal regulation only insofar as the safety standard was— *in fact*—adequate "to protect the public from unreasonable risks of injury or damage."[11]  Although a jury may be informed of and persuaded by a federal agency's decision-making process in promulgating the safety standard, the Legislature entrusted the final factual determination of that standard's adequacy to our juries alone, not federal agencies.[12]

---

[11] TEX. CIV. PRAC. & REM. CODE § 82.008(b)(1).  The Court asserts that "the Legislature made a policy decision that manufacturers at risk of liability for injuries caused by an allegedly defective design are entitled to rely on a federal agency's cogent determination that the pertinent risks associated with that design are not unreasonable."  *Ante* at 32.  Perhaps legislators were motivated by this policy in enacting the rebuttable presumption, but the enacted language says nothing of the kind.  *See In re Tex. Educ. Agency*, 619 S.W.3d 679, 687 (Tex. 2021) ("The polestar of statutory construction is legislative intent, which we determine from the enacted language."); *BankDirect*, 519 S.W.3d at 86 ("But our 181 legislators—who may have had 181 different motives, reasons, and understandings—nowhere codified an agreed purpose.").  And perhaps this may be good policy, "but judicial policy preferences should play no role in statutory interpretation." *McLane Champions, LLC v. Hous. Baseball Partners LLC*, 671 S.W.3d 907, 918 (Tex. 2023); *see BankDirect*, 519 S.W.3d at 78 ("[D]ivining what the law *is*, not what the interpreter *wishes* it to be" is "the foremost task of legal interpretation.").

[12] To the extent federal law preempts a products-liability claim, the decision would be out of the jury's hands and for the federal agency.  But federal preemption does not apply here because even if state tort liability has the practical effect of restricting a manufacturer's choice of seatbelt design, it "does not '[s]tand as an obstacle to the accomplishment . . . of the full purposes and objectives' of federal law."  *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 336 (2011) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (holding that a federal safety standard did not preempt a tort claim premised on a manufacturer's failure to install safer seatbelts); *see* 49 U.S.C. §§ 30102(a)(10) (describing a "motor vehicle safety standard" as a "minimum standard"), 30103(e) ("Compliance with a motor vehicle safety standard

The Court cabins the jury's role and divines these limitations by asserting, "If the standard for rebutting the presumption mirrored the standard for a product defect, then the presumption would serve no purpose at all."[13]  But this argument rests on a faulty premise.  In Utah, for example, the standards for a product defect and rebutting a similar presumption mirror each other: both require proof by a preponderance of the evidence that the product is unreasonably dangerous.[14]  But the presumption is not "a nullity," according to our sister court, because it "gives a kind of legal imprimatur to the significance of compliance with federal standards," "benefit[ting] the manufacturer."[15]  The presumption "clearly communicates" and "highlight[s] for the jury" "the significance of compliance,"[16] making a properly instructed jury "less

prescribed under this chapter does not exempt a person from liability at common law."); *MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 487-99 (Tex. 2010) (holding that a motor vehicle safety standard did not preempt a state tort claim asserting that a bus manufacturer should have installed safer seatbelts and laminated-glass windows).

[13] *Ante* at 25.

[14] *Egbert v. Nissan N. Am., Inc.*, 167 P.3d 1058, 1061 (Utah 2007) (citing UTAH CODE § 78–15–6(3), now numbered as § 78B–7–703); *Niemela v. Imperial Mfg., Inc.*, 263 P.3d 1191, 1196 n.4 (Utah Ct. App. 2011) ("The proof required to rebut the presumption appears to be identical to the proof required to establish the first element of a prima facie case.  Thus, with or without the presumption, the plaintiff must prove by a preponderance of the evidence that the product is unreasonably dangerous." (internal citations omitted)).

[15] *Egbert*, 167 P.3d at 1062 (agreeing "that the Legislature must have intended to benefit the manufacturer by creating the presumption of nondefectiveness"); *see Niemela*, 263 P.3d at 1196 n.4 (noting that "the two standards, though identically worded, are not necessarily identically onerous" as a practical matter).

[16] *Egbert*, 167 P.3d at 1062.

6

likely to conclude that a product is unreasonably dangerous."[17]  Thus, even if the standards mirror each other, the presumption would not be meaningless.  And regardless, the effect of any mirroring provides no basis for importing extra-textual limitations on when a jury could find that a federal safety standard was inadequate to protect the public.[18]

I nevertheless agree with the Court that, in Texas, the statutory language governing rebuttal of the presumption does not perfectly mirror the liability standard.  Rather, it shifts the factfinder's focus from the product and its intended user to the safety standard and to the public as a whole.  As a result, when the presumption applies, liability generally may not be imposed unless a jury finds *both* that the product was defectively designed and that the applicable safety standard was inadequate.[19]  Although these findings of fact are similar, the Court's approach is not necessary to imbue the presumption with meaning because the jury would weigh and balance the evidence under the separate inquiries differently.

To determine that a product is defectively designed, "the jury must conclude that the product is unreasonably dangerous as designed,

---

[17] *Niemela*, 263 P.3d at 1196 n.4 (discussing *Egbert*, 167 P.3d at 1062).

[18] *See PHI, Inc. v. Tex. Juv. Just. Dep't*, 593 S.W.3d 296, 305 (Tex. 2019) ("[N]o court has the authority, under the guise of interpreting a statute, to engraft extra-statutory requirements not found in a statute's text.").

[19] *See Wright v. Ford Motor Co.*, 508 F.3d 263, 274 (5th Cir. 2007) ("[If] rebutting evidence is *not* such as to require as a matter of law that the federal standards be held inadequate, but rather presents a fact question in that respect, then, in a jury tried case, it appears logical to conclude that the statute proceeds on the assumption that any such fact question as *whether* the presumption has been rebutted will be submitted to the jury.").

taking into consideration the utility of the product and the risk involved in its use."[20]  In balancing whether the product's risks outweigh its utility—thereby rendering the product design unreasonably dangerous—this Court has specified five factors to be considered:

> (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of the general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer.[21]

"This balancing is for the jury unless the evidence allows but one reasonable conclusion."[22]

When a safety standard greenlights an unreasonably dangerous product to be sold on the open market, it exposes the public to the risks of injury or damage associated with that product's use.  For that reason, these risk–utility considerations also would be pertinent to whether the

---

[20] *Emerson Elec. Co. v. Johnson*, 627 S.W.3d 197, 205 (Tex. 2021) (quoting *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 432 (Tex. 1997)).

[21] *Id.* (quoting *Grinnell*, 951 S.W.2d at 432); *see id.* at 209 (noting that "[w]e would not today conclude that including a legally correct instruction about the[se] factors was charge error" and assuming, without deciding, that "a listing of the[se] factors would assist the jury in determining whether a design defect exists").

[22] *Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 10 (Tex. 2015).

standard was "inadequate to protect the public from unreasonable risks of injury or damage."[23]  As with the design-defect inquiry, the balancing would be for a jury alone, so long as the conclusion is one a reasonable jury could reach.  But given the statute's shift in emphasis for rebutting the presumption, a jury would balance these considerations differently by placing greater weight on the evidence of the factors that implicate the public as a whole.  Rarely are these holistic inquiries conclusively proven as a matter of law,[24] and in most cases, a finding that a product is unreasonably dangerous would not necessitate a finding that the standard is inadequate to protect the public.[25]

By requiring both findings of fact to impose liability, the statutory scheme offers far more than what the Court describes as "illusory protection to compliant manufacturers."[26]  In contrast, the Court unduly restricts the focus to the federal government's decision-making, deriving exclusive requirements to rebut the presumption—e.g., an arbitrary-or-capricious standard or a "comprehensive review"—that are neither expressed in nor contemplated by the statutory text.  Honda

---

[23] TEX. CIV. PRAC. & REM. CODE § 82.008(b)(1); *see ante* at 27 (acknowledging that evidence of a defective design "can certainly also be relevant to the adequacy of the regulation allowing that design").

[24] *See Genie Indus.*, 462 S.W.3d at 3 (noting that whether a product's risks outweigh its utility "is usually one of fact for the jury").

[25] I therefore disagree with the Court's characterization of my position as requiring the following analysis: "a defendant is liable for a defective design if the plaintiff proves X, unless the product complies with an applicable federal safety standard, in which case the defendant is not liable unless the plaintiff proves X (which has already been proven)." *Ante* at 28.

[26] *Id.*

likewise argues that "recognition of agency expertise . . . requires that a jury's evaluation of federal safety regulations must be cabined"; otherwise, a jury would have "free rein to second-guess and effectively overrule the expert determinations of federal agencies" and "nullif[y]" federal standards.

These policy arguments have no textual basis. The statute does not pose the question of whether the promulgating *federal agency*—rightly or wrongly—considered the safety standard adequate to protect the public. As I have already noted, a federal agency's determination may have persuasive force, but the inadequacy question is for the jury alone. Nor is this the power to nullify federal standards or overrule agency decisions. A federal safety regulation still serves as a minimum standard even if a jury disagrees with the promulgating agency and finds it inadequate to protect the public.[27] And by complying with the applicable minimum standard, a manufacturer acquires the protection of a presumption that imposes an additional hurdle before liability will attach while still bearing any resulting tort liability "as a cost of doing business."[28]

---

[27] *See MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 495 (Tex. 2010) ("[W]e must be mindful that Congress generally intended the federal safety standards to set a minimum standard for performance and allowed juries to determine in particular cases if the vehicle manufacturer should have done more.").

[28] *Cf. Hyundai Motor Co. v. Alvarado*, 974 S.W.2d 1, 12 (Tex. 1998) ("[T]he imposition of common-law liability does not impose any particular safety standard upon a manufacturer; the manufacturer may choose to comply with the minimum federal standards and bear tort liability as a cost of doing business.").

## II

Because the question of whether a safety standard adequately protects the public falls squarely within the factfinder's discretion, I now turn to whether legally sufficient evidence supports the jury's finding. The "test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."[29] "All the record evidence must be considered 'in the light most favorable to the party in whose favor the jury verdict has been rendered,' and 'every reasonable inference deducible from the evidence is to be indulged in that party's favor.'"[30] Judgment against a jury verdict is proper "only when the law does not allow reasonable jurors to decide otherwise."[31] When measured against the charge, which tracked the statutory language establishing an injured party's rebuttal burden, the evidence here surpasses the low legal-sufficiency threshold.

As brief background, twenty-three-year-old Sarah Milburn suffered quadriplegia paralysis after being clotheslined by the shoulder strap of her seatbelt in a rollover collision while taking an Uber ride in a 2011 Honda Odyssey. Sitting in the middle seat of the third row, Milburn had pulled the ceiling-mounted belt across her body, attaching it to the buckle at her left hip. But because the belt's detachable anchor was not connected to the minibuckle at her right hip, her lap was left unrestrained. The following diagram depicts the configuration:

---

[29] *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

[30] *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018) (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

[31] *City of Keller*, 168 S.W.3d at 823.

11



Honda designed this system so that when the anchor is detached and the belt has retracted into the ceiling, the seat may be folded down into a recessed compartment in the floor pan, providing extra cargo space. This design was incorporated into more than 800,000 Honda Odysseys that were sold in the United States from 2011 through 2017. No one disputes that Honda's design complied with safety standard 208 of the Federal Motor Vehicle Safety Standards (FMVSS 208), promulgated by the National Highway Traffic Safety Administration (NHTSA).[32]

The evidence presented at trial is legally sufficient to support the jury's finding that FMVSS 208 was inadequate to protect the public from unreasonable risks. First, the jury heard testimony that the seatbelt design was unreasonably dangerous, which the Court agrees is "relevant to the adequacy of the regulation allowing that design."[33] Milburn's human-factors expert, Joellen Gill, opined it was foreseeable that

---

[32] *See* 49 C.F.R. § 571.208. Although Milburn does not dispute that FMVSS 208 "applied to the Odyssey and w[as] complied with," she challenges whether the safety standard governed the alleged product risk, *see supra* note 5, and was adequate to protect the public from unreasonable risks.

[33] *Ante* at 27.

(1) owners would not reliably maintain the detachable seatbelt in the anchored position, (2) a person sitting in the third-row middle seat would not reliably use the seatbelt correctly, and (3) a passenger would fail to recognize that they were not properly buckled.[34]  Milburn's engineering expert, Steven Meyer, discussed the importance of having a lap restraint during a rollover collision to hold the passenger's entire lower torso in place.  If the passenger is wearing only a shoulder belt due to misuse by the vehicle owner or passenger, the seatbelt becomes an injurious and potentially fatal device because it is dangerously close to the passenger's neck.  A safer, feasible alternative design that should have been used, Meyer opined, is an all-belts-to-seat design (also called a seat-integrated belt system) that is anchored at the top and bottom of the seat rather than the ceiling-mounted detachable belt design.[35]

---

[34] Gill also opined that Honda failed to effectively mitigate these hazards and that Milburn's actions were consistent with foreseeable human behavior.  As a human-factors expert, Gill was qualified to testify about how people would interact with the detachable seatbelt system without having specialized experience in the automotive industry.  *See, e.g.*, *Tyson Fresh Meats, Inc. v. Abdi*, No. 07-12-00546-CV, 2014 WL 2447472, at *3-4 (Tex. App.—Amarillo May 28, 2014, pet. denied) (holding that the trial court did not abuse its discretion by admitting testimony from a human-factors expert).  And to the extent Gill relied on usability studies conducted by Milburn's counsel, this did not render her testimony unreliable because the conditions in the studies were "substantially similar" to those during the accident.  *See Fort Worth & Denver Ry. v. Williams*, 375 S.W.2d 279, 281-82 (Tex. 1964) (holding that out-of-court experiments are generally admissible when there is "a substantial similarity between conditions existing at the time of the occurrence which gives rise to the litigation and those in existence at the time the experiment is conducted for demonstration purposes").

[35] Honda argues there is no evidence of a safer, feasible alternative design.  The court of appeals sufficiently addressed this issue, and I find no reversible error in its conclusion that Milburn "presented some evidence, and

Next, the jury heard testimony that FMVSS 208 is a "minimum standard" that does not account for the detachable belt's *usability*.[36] As Meyer explained, FMVSS 208 is the "bare minimum" that must be complied with to legally sell a vehicle in the United States, and because it "can only cover as much as [it] can cover," "a lot of it is left to the manufacturers." Meyer confirmed that nothing in FMVSS 208 addresses the risk that Milburn faced on the night of the accident—the risk that the belt would be improperly used with just the shoulder belt, leaving the passenger's lap unrestrained.

Although NHTSA expressly recognized that "detachable belts can be misused,"[37] the text and regulatory history discussed in the Federal Register provide no express indication that the agency analyzed or tested for the risk of misuse, as the Court acknowledges.[38] The Court instead simply surmises that NHTSA must have considered the safety

---

therefore legally sufficient evidence, to support the jury's finding that the [all-belts-to-seat] design is a safer alternative to the detachable anchor seat belt design." 668 S.W.3d 6, 26 (Tex. App.—Dallas 2021).

[36] *See* 49 U.S.C. § 30102(10) (defining "motor vehicle safety standard" as "a minimum standard for motor vehicle or motor vehicle equipment performance"). Among other things, FMVSS 208 permits vehicle manufacturers, for certain inboard seating positions, to use "a belt incorporating a release mechanism that detaches both the lap and shoulder portion at either the upper or lower anchorage point, but not both," provided that the means of detachment is "a key or key-like object." 49 C.F.R. § 571.208.

[37] *Federal Motor Vehicle Safety Standards; Occupant Crash Protection*, 69 Fed. Reg. 70904, 70908 (Dec. 8, 2004) (codified at 49 C.F.R. pts. 571, 585).

[38] *Ante* at 22 (concluding that FMVSS 208 governs the risk of misusing detachable seatbelts despite acknowledging that "the regulation itself does not discuss the risk that people will not understand how to operate the detachable system").

14

risks of misuse in its cost–benefit analysis.[39]   On cross-examination, Honda's seatbelt expert, Michael Klima, also acknowledged that FMVSS 208 neither "analyzes the risk that people won't understand how to operate" the detachable seatbelt system nor requires any type of usability testing to determine whether people understand the double-latch system.  According to Klima, this type of testing is left to the manufacturers to address however they deem fit.

Finally, the jury heard evidence that NHTSA's rationale for allowing the detachable seatbelt design was unsound.  Meyer discussed that in promulgating FMVSS 208, NHTSA drew upon comments from automobile manufacturers to conclude that adopting a seat-integrated belt design would have cost only an additional $15 per seat, which he described as "not terribly expensive."[40]   Although NHTSA found this system "particularly problematic for removable seats because of the added weight,"[41] Meyer explained that "[t]he weight penalty in this case would be irrelevant because it's a folding seat."  Comparing the benefits of not spending $15 for a seat-integrated system to the risks of neck injuries, which are often "permanently debilitating" or "fatal," Meyer opined, "it's grossly outweighed."

---

[39] *Id.* at 22-23.

[40] *See Federal Motor Vehicle Safety Standards; Occupant Crash Protection*, 69 Fed. Reg. at 70908 (concluding that the total cost for an integrated belt would be approximately $47 while a detachable belt system would cost approximately $32).

[41] *See id.* ("[W]e have decided to expand the detachability provision to the inboard seating position of folding seats . . . .  We believe that integrated belt designs are not an optimal design for all types of seats.  They appear to be particularly problematic for removable seats because of the added weight.").

By the end of trial, the jury had heard evidence that (1) FMVSS 208 is a minimum standard that allows manufacturers to produce and sell an unreasonably dangerous detachable seatbelt, (2) the standard does not adequately account for the risks associated with the seatbelt design, and (3) the seatbelt was incorporated not only in the vehicle at issue but also in more than 800,000 other vehicles sold to the public on the open market. Acting in its fact-finding role, the jury could credit this evidence over any contrary evidence in finding that FMVSS 208 was inadequate to protect the public from unreasonable risks of injury or damage. Because a reasonable jury could conclude that FMVSS 208 was inadequate to protect the public, the balancing and weighing of evidence is for the jury alone. The Court should not disturb its verdict.

### III

In a concurring opinion, JUSTICE BLACKLOCK explains that a safety regulation's adequacy to protect the public is a fact question requiring jurors to exercise an "essentially political judgment" that courts must not "second-guess" by imposing their "own value-laden policy judgments."[42] Consistent with my discussion above, I full-heartedly agree that "a jury's disagreement with the agency's decision should be essentially unreviewable."[43] Where we diverge is on what constitutes a "sufficient evidentiary predicate" for the jury to exercise that judgment.[44]

---

[42] *Ante* at 3-4 (Blacklock, J., concurring).

[43] *Id.* at 4.

[44] *Id.* at 3.

16

The concurrence would require a "qualified regulatory expert" to hold the jurors' hands as they exercise their political judgment.[45]  Under that view, a regulatory expert is necessary to explain the historical context and the competing considerations and values an agency must balance in promulgating a safety regulation.[46]  Such testimony may undoubtedly be relevant and admissible either to show that a safety regulation is inadequate to protect the public or as a controverting arrow in a manufacturer's quiver.[47]  But I cannot agree that a qualified regulatory expert is always *required* to rebut the statutory presumption.

Jurors do not need a regulatory expert to tell them *how* to think, process information, or exercise their political judgment.  "Expert testimony is required when an issue involves matters beyond jurors' common understanding,"[48] and individual judgment is certainly *not* beyond an individual juror's understanding.  Jurors can second-guess a federal agency's decision without any *particular type* of expert spoon-feeding them the historical context and considerations that contributed to a promulgated regulation (to the extent such evidence is

---

[45] *Id.* at 5.

[46] *Id.*

[47] *Cf., e.g.*, *Antrim Pharms. LLC v. Bio-Pharm, Inc.*, 950 F.3d 423, 430-31 (7th Cir. 2020) ("[C]ourts have permitted regulatory experts to testify on complex statutory or regulatory frameworks when that testimony assists the jury in understanding a party's actions within that broader framework."); *In re Fosamax Prods. Liab. Litig.*, 509 F. App'x 69, 72-73 (2d Cir. 2013) (relying on a regulatory expert's testimony to support a jury instruction regarding a Florida statute's analogous rebuttable presumption of nondefectiveness (citing FLA. STAT. ANN. § 768.1256(1))).

[48] *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006).

even necessary for them to exercise the independent judgment the statute contemplates).[49]

In this case, for example, Milburn's expert Meyer, a licensed lawyer as well as an engineer, testified that he had experience reviewing the Federal Register, which NHTSA uses to provide notice of its proposed rulemaking, solicit comments, and ultimately justify and publish its regulations. On cross-examination, Meyer read into the record and addressed portions of NHTSA's published rationale for adopting FMVSS 208.[50] In so doing, Meyer described NHTSA's role in the federal government, acknowledged that anybody could submit comments after a notice of proposed rulemaking,[51] and discussed the "history of the standard" as a response to "a congressional mandate [Anton's Law[52]] that the agency begin to phase in requirements for

---

[49] As a practical matter, expert causation testimony is already required in most design-defect cases, a costly endeavor for all involved. *Mack Trucks*, 206 S.W.3d at 583; *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 137 (Tex. 2004). Increasing costs by requiring another type of expert—for the sole purpose of rebutting a statutory presumption—will only further impede individuals from bringing potentially meritorious design-defect claims.

[50] *See Federal Motor Vehicle Safety Standards; Occupant Crash Protection*, 69 Fed. Reg. 70904, 70904-16 (Dec. 8, 2004) (codified at 49 C.F.R. pts. 571, 585) (describing the background, summarizing public comments, explaining the requirements of the final rule, conducting a cost–benefit analysis, and adopting a final rule amending FMVSS 208).

[51] *See, e.g.*, *Federal Motor Vehicle Safety Standards; Occupant Crash Protection*, 68 Fed. Reg. 46546, 46546-59 (proposed Aug. 6, 2003) (to be codified at 49 C.F.R. pts. 571, 585) (describing background and safety concerns, requesting comments, and proposing a rule amending FMVSS 208).

[52] Anton's Law (Improvement of Safety of Child Restraints in Passenger Motor Vehicles), Pub. L. No. 107-318, 116 Stat. 2772 (2002).

lap/shoulder belts for all rear seating positions wherever practical."[53] And in reference to the Federal Register, Meyer confirmed for the jury that NHTSA considered the following in adopting FMVSS 208:

- the possibility of requiring integrated belts;

- the cost of "strengthening both the seat and the floor pan" for an integrated belt, which would be "approximately $47" while "a detachable belt system would be $32";

- "the additional weight added to a seat as a result of this strengthening," which would "make removability of the seats impractical" according to some submitted comments, although "[General Motors] noted that one of its vehicles has removable seats with an integrated seat belt";

- manufacturers appear to be moving away from removable seats towards fold-down seats to provide additional cargo-carrying capacity;

- "prohibiting detachability limits the effective use of the cargo-carrying space" because "the shoulder belt would extend from the upper anchorage down into the folded seat"; and

- the "possibility for misuse" of "only using the lap belt" could be reduced by requiring a minibuckle with a "key or key-like object to detach the belt," although this addresses a "different type of misuse" than only using the shoulder strap.[54]

In other words, the jury heard how NHTSA considered the competing considerations of safety, cost, convenience, and practicality in

---

[53] *See Federal Motor Vehicle Safety Standards; Occupant Crash Protection*, 69 Fed. Reg. at 70904.

[54] *See id.* at 70908-09. In this Court, Honda acknowledges that the "jury could rely on NHTSA's comments to the Final Rule amending FMVSS 208" as evidence of what NHTSA considered and balanced "when promulgating FMVSS 208" and that, although the relevant portion of the Federal Register was not admitted into evidence, Meyer agreed on cross-examination "that Honda's counsel correctly read excerpts from the Final Rule to the jury."

declining to require a seat-integrated belt and allowing a detachable belt for the middle seat of a vehicle's third row. With this testimony and the other trial evidence in mind, the jurors could make their own informed judgment as to FMVSS 208's adequacy to protect the public from unreasonable risks: they knew "something about how the regulatory process works" and had a "sense" of the "conflicting considerations and competing values" that contributed to the regulation's promulgation.[55]

In contrast to the concurrence, the Court implies that a regulatory expert may not be necessary.[56] Even so, its new requirements are no less onerous. According to the Court, a jury's inadequacy finding must be supported by "a comprehensive review of the various factors and tradeoffs NHTSA considered in adopting that safety standard."[57] The Court does not demarcate when a jury's review of relevant considerations rises to the level of "comprehensive."[58] But in concluding that Milburn's evidence is legally insufficient, the Court instead nitpicks about her expert's failure to address granular considerations that the Court presumes "*would* have affected NHTSA's risk–benefit analysis."[59]

---

[55] *See ante* at 5 (Blacklock, J., concurring).

[56] *Ante* at 33 n.21.

[57] *Id.* at 32-33.

[58] The Court merely states that "considerably more evidence of the various considerations . . . is required than Milburn presented." *Id.* at 30.

[59] *See id.* at 31 (emphasis added); *see also id.* at 30-32 (criticizing Milburn for not addressing how NHTSA's analysis would have been affected by the lower occupancy rate in a rear center seat, the lack of reports or statistics of misuse, or the expectations of whether a driver would have reliably attached the detachable belt before transporting a passenger).

In effect, the Court requires that a plaintiff produce evidence addressing all possible considerations that conceivably could affect a federal agency's analysis in adopting the safety regulation at issue. But *what* the federal regulators considered is an entirely different question from whether the adopted safety standard is, in the jury's estimation, *inadequate to protect the public* as a matter of fact. Federal regulators could have considered everything they should have but still, at the end of the day, got it wrong. The jury does not need to hear about the regulatory process to conclude that compliance with the end product—a *minimum* safety standard—was not enough to protect the public. And although the Court pays lip service to leaving open the possibility that a federal agency "simply got it wrong,"[60] any such opening is illusory. Requiring the jury to evaluate all possible considerations at varying levels of granularity is nigh impossible—a herculean task to overcome. Neither Section 82.008(b)(1)'s plain language nor our legal-sufficiency standards require such a parsimonious approach.

Ultimately, a reviewing court must simply ask: was there a sufficient evidentiary basis from which reasonable jurors could exercise their political judgment to determine that a federal safety regulation was inadequate to protect the public from unreasonable risks of injury or damage? For all the reasons described above, the answer here is a resounding yes.

---

[60] *Id.* at 33 n.23.

\* \* \*

Under the language the Legislature enacted, a plaintiff seeking to rebut the statutory presumption need only establish that the applicable safety standard—whether rightly or wrongly adopted—was inadequate as a matter of fact to protect the public from unreasonable risks of injury or damage. Where text is clear, it is determinative, and "[p]lain language disallows ad-libbing."[61] Forsaking this cardinal principle, the Court engrafts onto Section 82.008(b)(1) an atextual and heightened deference-to-the-agency standard for injured Texans to rebut the nonliability presumption. Milburn should not be forced to suffer the consequences of the Court's deviation from the statutory text. She proffered legally sufficient evidence to meet the statutory burden as written, and the jury found in her favor.

But even if it were proper to overturn the jury's verdict, justice demands—at a minimum—that Milburn have a fair opportunity to present evidence to satisfy the Court's newly articulated standard for rebutting the presumption.[62] "The case for remand is especially compelling in cases where, as here, [the Court has] substantially clarified the law."[63] And the Court has previously done so when

---

[61] *BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 80 (Tex. 2017).

[62] *See* TEX. R. APP. P. 60.3 ("[T]he Supreme Court may, in the interest of justice, remand the case to the trial court even if a rendition of judgment is otherwise appropriate.").

[63] *Rogers v. Bagley*, 623 S.W.3d 343, 358 (Tex. 2021)); *see, e.g., Carowest Land, Ltd. v. City of New Braunfels*, 615 S.W.3d 156, 159 (Tex. 2020) (holding that substantial clarification of the law warranted remand); *Hamrick v. Ward*,

interpreting a "unique statutory provision"—like the one here—as a matter of first impression.[64]  I cannot join the Court's opinion or judgment when the Court improperly rejects the jury's verdict and rubs salt in the wound by rendering, rather than remanding.  I would respect the jury's verdict and affirm the court of appeals' judgment, but failing that, I would give Milburn a fair chance at securing recompense for Honda's business choices.  Because the Court does otherwise, I must respectfully dissent.

John P. Devine
Justice

**OPINION FILED:** June 28, 2024

---

446 S.W.3d 377, 385 (Tex. 2014) (observing remand is "particularly appropriate" when the losing party may have presented their case differently).

[64] *See 20801, Inc. v. Parker*, 249 S.W.3d 392, 394-96, 400 & n.5 (Tex. 2008) (remanding after interpreting "for the first time today" a "unique statutory provision" because the plaintiff "could not have reasonably anticipated the standard we announce today"); *In re Doe 2*, 19 S.W.3d 278, 283 (Tex. 2000) (noting that the rule for remand "is particularly well-suited to situations such as this one, where courts must apply the requirements of a unique or novel statutory scheme"); *ante* at 23-24 (noting that the interpretation of this statutory provision is a matter of first impression); *ante* at 3 (Blacklock, J., concurring) (acknowledging the statute's unique and unusual nature); *see also Low v. Henry*, 221 S.W.3d 609, 621 (Tex. 2007) (remanding in the interest of justice to allow parties to present evidence responsive to newly expressed guidelines for imposing sanctions under Chapter 10 of the Civil Practice and Remedies Code); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 26 (Tex. 1994) (remanding in the interest of justice because the trial was conducted at a time when no opinion from this Court had specifically addressed the standards governing the imposition of punitive damages in bad-faith lawsuits and because the decision represented a "substantial clarification" of the standard).